**Morton BORROW, Appellant**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**No. 15473.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 23, 1960.

Decided June 30, 1960.

Mr. Victor Rabinowitz, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for appellant. Mr. Leonard B. Boudin, New York City, also entered an appearance for appellant.

Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, with whom Mr. John L. FitzGerald, General Counsel, Federal Communications Commission, Mr. Max D. Paglin, Asst. General Counsel, Federal Communications Commission, and Mr. Joel Rosenbloom, Counsel, Federal Communications Commission, were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and WILBUR K. MILLER and WASHINGTON, Circuit Judges.

PRETTYMAN, Chief Judge.

Appellant Borrow was an applicant for the renewal of a radio operator's license, first-class. This license would entitle him to operate transmitter apparatus at radio or television stations, aboard vessels of the Merchant Marine, and at coast radio stations. He had held similar licenses, each limited to a term of years, since 1927. At the time of his latest application for renewal he was employed by the operator of two radio stations in Philadelphia. In connection with this application he was asked by the Communications Commission, as part of the requisite date, two questions which are the subject of the present controversy. They were:

"1. Are you now or have you ever been a member of the Communist Party?

"If the answer is yes, give dates of membership:

"2. Are you now or have you ever been a member of any organization or group which advocates or teaches the overthrow of the Government of the United States, or of any political subdivision thereof, by force or violence?

"If the answer is yes, list the organization or group and give the dates of membership:"

Borrow refused to answer either question, on the ground that the Commission had no legal authority to require answers to these inquiries as a prerequisite to renewal of his license. He requested a hearing in the following language:

"Under the circumstances I hereby request a hearing so that I may present in the appropriate form my reasons for refusal to answer the questionnaire."

Such a hearing was held, and an initial decision by the Examiner and a final decision by the Commission were rendered. The proceedings did not involve the grant or refusal of the license. They involved only the questions (1) whether the Commission had the right to ask the questions and (2) whether, if so, Borrow's refusal to answer precluded a determination that he was qualified to hold the license requested.

The Commission reaffirmed the position it had taken in a previous case [1] and, after a long discussion, concluded:

"24. In summary, the Commission has determined that, in ascertaining whether a grant of Mr. Borrow's application would serve the public interest, it requires information as to whether or not he belongs to or has belonged to certain organizations which advocate or are reputed to advocate the overthrow of the government of the United States

---

1. Travis Lafferty, 23 F.C.C. 761, 13 P & F RR 641 (1957).

by force and violence. It requires such information as a prerequisite to reaching the statutorily necessary conclusion that a grant of the subject applications would serve the public convenience, interest or necessity, because of the nature of the employment available to licensees and the close relationship of such employment to the interests of national defense. * * * In the absence of the requested information, the Commission would deem it an abuse of its discretion to affirmatively conclude that a grant of Mr. Borrow's application would serve the public interest."

The Commission dismissed the application.

No procedural defects appear in the proceedings. The hearing requested was granted. The applicant was present and was represented by counsel. The full Commission later heard the matter, considered it, and decided it.

We examine the power of the Commission in respect to issuing operators' licenses. The Communications Act,[2] in Section 303, provides:

"Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity require, shall—

\* \* \* \* \* \*

"(l) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to such citizens of the United States as the Commission finds qualified, * * *."

The statute requires the Commission to make available a nation-wide radio service, *inter alia*, "for the purpose of the national defense." [3]

■ Thus it is clear upon the face of the statute that the Commission is empowered to prescribe the qualifications of station operators and to issue licenses only to those whom it finds qualified. It is not authorized to issue licenses except as the public interest, convenience or necessity requires—not "permits" but "requires". Pursuant to this statutory authority the Commission has prescribed that no license will be issued until the applicant has successfully passed a technical examination and "is found qualified in respect to citizenship, character, and physical condition".[4] "Character" in respect to a radio operator obviously includes reliability in the situations in which such an operator must operate.

■ So the problem before us is whether the questions asked were pertinent to the requirements of the public interest, etc., and to proper standards of qualification for a radio operator. This is a practical, not merely an academic, problem. It seems to us it would be difficult to imagine a question more relevant or more material to the qualification of a radio operator under the statutory criteria than is the second of the two questions asked. Radio beams are the operational essence of quick modern communication and of the control of modern weapons. Not only the power to use these electronic devices but the power to interfere with waves being used by others should, it might properly seem to the Commission, be lodged in those whose loyalty to the United States is made to

2. 48 Stat. 1064 (1934), as amended, 47 U.S.C.A. § 151 et seq.

3. Sec. 1, 47 U.S.C.A. § 151.

4. 47 C.F.R. § 1.71(a). The Senate Committee on Interstate and Foreign Commerce, in reporting favorably on an amendment to the Communications Act not here relevant, added the following caveat: "Under the provisions of the Federal Communications Act of 1934, as amended, the Federal Communications Commission is required to find, with regard to every license issued by it, that the public interest will be served thereby. In making this finding, the Commission necessarily must weigh the character qualifications of persons seeking radio operator licenses. The committee desires to emphasize that this bill, as amended, does not relieve the Commission of this affirmative responsibility." S.Rep. No. 2338, 85th Cong., 2d Sess. (1958).

appear. Surely no such power should knowingly be accorded to those who belong to organizations advocating or teaching the overthrow of this government by force or violence.[5] At the very least the Commission is entitled to know whether those whom it licenses to control these devices belong to such an organization. Any program less than that simple necessity would be not only shortsighted but dangerous to the national security.

Before the Commission and before us the thrust of Borrow's argument was his complaint concerning the first of the two questions asked, i. e., the question relating to membership in the Communist Party. But he refused to answer the second question also, i. e., the question relating to membership in an organization which teaches or advocates the overthrow of the Government of the United States by force and violence. The Commission commented:

"* * * at least with respect to this question, even Borrow does not argue as to the propriety of the Commission's inquiry and he presents no color of justification for his refusal to answer. On the sole basis of his refusal to answer this clearly pertinent question, and his failure even to allege good cause for his refusal, the Commission would be required to dismiss his application."

Surely this second question could not be characterized as a mere inquiry into political affiliations. Such advocacy is a crime; indeed one of the highest order. No justification for the refusal of an applicant for a radio operator's license to answer this question is shown to us, nor can we conceive of one.

In his concurring opinion in the Joint Anti-Fascist case,[6] Mr. Justice Douglas wrote succinctly:

"The problem of security is real; and the Government need not be paralyzed in handling it. The security problem, however, relates only to those sensitive areas where secrets are or may be available, where critical policies are being formulated, or where sabotage can be committed. * * * The question is one of the fitness or qualifications of an individual for a particular position."

The area involved in the case at bar is a sensitive area. Secrets of international communications are available; critical policies are formulated by the interchange of radio communications; opportunities for sabotage at critical times by false messages, by failing to shut down the station when ordered to do so, by "jamming" necessary broadcasts, are plentiful and critical. The question before the Commission, in direct, stark form, was the fitness of this applicant for a particular position, as a radio operator—not upon the merits of all relevant data but in the face of his refusal to answer questions required as part of his application.

The underlying premise of Borrow's argument, discussing almost entirely the first question put to him, is that membership in the Communist Party is merely a matter of political affiliation. This court has repeatedly pointed out that the President, the Congress, and the Supreme Court have declared in emphatic terms that the Communist movement is a world-wide conspiracy for power, inimical to the peace of the world and to the safety of this country. In the present

---

5. The position of radio operators with respect to our national defense was described during World War II by Mr. Fly, then Chairman of the Communications Commission, in testimony before the House Committee on Appropriations, 77th Cong., 2d Sess., on the first Supplemental National Defense Appropriation Bill for 1943, page 17 (1942). He said they are the men "who are sitting at the nerve centers of our whole military system". We think the description is equally apt today.

6. Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 181, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

state of world affairs adherence to the Communist cause is not merely a political opinion. Membership in the Party *vel non* is a proper introductory query in this area; the answer may dispose of the subject, or it may necessitate explanation which, in turn, may or may not be acceptable.

■ Borrow says his First Amendment rights are being infringed. We cannot agree. His right to be a licensed radio operator is not unlimited, merely because of the First Amendment. Qualifications of character, reliability and judgment apply. The public interest must be served. He desires to operate a facility which in the public interest is necessarily licensed by the Government. He has affirmative standards to meet in order to secure a license, just as do doctors, lawyers, barbers, and lenders of money. An unqualified right to pursue any chosen occupation, merely by reason of the First Amendment, is a wholly untenable proposition. As the Court observed in American Communications Ass'n v. Douds,[7] the Amendment "does not require that he be permitted to be the keeper of the arsenal."

Borrow relies upon Graham v. Richmond,[8] but that case did not deal with our present problem. There the appellant had been denied a hearing although the regulations provided for one. The decision of this court, premised upon Service v. Dulles,[9] was that the regulations must be complied with and a hearing afforded. No such problem is now at bar, as Borrow was given the hearing he requested.

The conclusions of the Commission in this matter were exhaustive, careful, well-reasoned. Its decision is

Affirmed.

WASHINGTON, Circuit Judge (dissenting).

I do not doubt that there are strong reasons of public policy for seeking to insure that radio operators will be loyal and trustworthy at all times, and particularly in the event of a national emergency. But the same is true of a large part of our population, given the times in which we live. Railroad engineers, airline pilots, electrical system operators, reservoir inspectors, gas pipeline controllers—the list of people who can play vital roles in the functioning or nonfunctioning of our system is well-nigh endless. If these people are required to be licensed by some federal, state or local agency— and many of them are—does it follow that the licensing authority can ask them about possible Communist connections, and deny them a license (and possibly a livelihood) for failure to answer? Or for giving an unacceptable answer? Perhaps we will come to that. But if we do, it should be a legislative and not an administrative decision: a decision made after careful consideration of the needs of the national security, and of the possible consequences on the availability, mobility and self respect of our people. Decisions of that sort should be made after fullest deliberation, by those who represent the electorate—rather than by appointed officials regulating a single segment of our economy.

The Supreme Court has made it quite plain that the Government cannot act to deprive a private individual of valuable rights and privileges on security grounds unless the deprivation has been clearly and validly authorized by law. Greene v. McElroy, 1959, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377; Kent v. Dulles, 1958, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed. 2d 1204. Cf. Konigsberg v. State Bar, 1957, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 2d 810. Here I can find no such authority.

The Communications Commission relies on the statutory provisions authorizing it in general terms to prescribe the

---

7. 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

8. 106 U.S.App.D.C. 288, 272 F.2d 517 (D.C.Cir.1959).

9. 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).

qualifications for radio operators and to issue licenses to such citizens as it finds qualified, giving due regard to the public interest. There is no specific statutory provision empowering the Commission to inquire on security grounds into the Communist or other affiliations of an applicant for a license. Nor is there any valid basis for implying that Congress intended that the Commission have such authority.

On the contrary, Congress has refused in the past to give the Commission the authority it now claims to possess. The Izac bill in 1940,[1] the Dirksen bill in 1941,[2] and the Bland bill in the same year[3] —all would have given the Commission the power to refuse to license "subversives" as radio operators. None of these bills, with the exception of Bland, reached the floor. All, including Bland, were based on the assumption that the Commission lacked the requested authority. The Bland bill was rejected in the Senate. Congress did, however, pass a bill giving like authority to the Navy Department with respect to radio operators in the Merchant Marine. This statute has now lapsed by reason of the termination of hostilities.

One reason the Bland bill failed was that the Communications Commission itself objected to it, largely on the ground that the Commission was unprepared to make investigations into subversive activities, and did not wish to undertake them. Nothing appears which would suggest that the Commission is equipped today to pass upon such matters. Certainly there is nothing to suggest that Congress has by implication authorized it to do so. The statutory language on which the Commission now relies is the same language that has been on the books since 1927.[4] If this language gave no authority in this field in the past, it gives none today.

In 1955 the Commission began consideration of a proposed rule which would prohibit the issuance of radio operators' licenses to members of the Communist Party.[5] Those proceedings are still pending—undetermined. The Commission has adopted no regulation barring Communists or subversives. It has set no standards and fixed no procedures. Its application forms contain no mention of the matter, much less any questions about it. But of late the Commission has sent supplemental letters to certain applicants, asking the questions here complained of. This procedure is not supported by any published rule.

Compared to the flimsy framework on which the Commission rests its case, the statutory and regulatory basis on which the Secretary of State rested his claim to deny passports on security grounds in Kent[6] was truly monumental. Yet the Supreme Court struck down his claim, sturdily buttressed as it was. In the instant case, where a man's livelihood is involved, I think we have no alternative but to say that the Commission lacks the authority which it now asserts.

1. H.R. 10446, 76th Cong., 3d Sess. (1940) ; also introduced as H.R. 3364, 77th Cong., 1st Sess. (1941).

2. H.R. 2662, 77th Cong., 1st Sess. at §§ 107 and 108 (1941).

3. H.R. 5074, 77th Cong., 1st Sess. (1941).

4. See Sections 5(C) and (D) of the Radio Act of 1927, 44 Stat. 1164.

5. Dockets Nos. 11060 and 11061.

6. Kent v. Dulles, 1958, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204.