Edward **HOMER** et al., Appellants

v.

Alfred C. **RICHMOND**, Commandant,
United States Coast Guard,
Appellee.

No. 15751.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 15, 1960.

Decided April 20, 1961.

Mr. Leonard Boudin, Washington, D. C., with whom Messrs. David Rein and Joseph Forer, Washington, D. C., were on the brief, for appellants.

Mr. DeWitt White, Attorney, Department of Justice, with whom Mr. Kevin T. Maroney, Attorney, Department of Justice, was on the brief, for appellee.

Before BAZELON, FAHY and WASHINGTON, Circuit Judges.

FAHY, Circuit Judge.

The appellants, Homer, McCrea and Colcord, sued appellee, Commandant of the United States Coast Guard, for a direction by the court that the Commandant issue licenses to appellants as radiotelegraph officers eligible to serve as such in the United States Merchant Marine. They also sought a declaratory judgment that the regulations pursuant to which their applications had been denied by the Commandant were unconstitutional as applied to appellants. Summary judgment was granted in favor of the Commandant.

In denying the applications the Commandant had relied upon the Act of May 12, 1948.[1] This statute requires radiotelegraph operators on vessels of the Merchant Marine to be "licensed officers," and that an applicant must possess a valid first- or second-class radiotelegraph operator license issued by the Federal Communications Commission. It also provides,

"if, upon full consideration, they [the inspectors] are satisfied that his [the applicant's] character, habits of life, and physical condition are such as to authorize the belief that he is a suitable and safe person to be entrusted with the powers and duties of such a station, they shall grant him a license * * *."[2]

Under the regulations the Commandant may reject an application,

"when derogatory information has been brought to his attention which indicates that the applicant's character and habits of life are such as to authorize the belief that he is not a suitable and safe person to be entrusted with the duties of radiotelegraph operator on any vessel."[3]

Others excluded are those convicted of violating narcotic laws within ten years prior to applying,[4] or of certain named offenses committed on shipboard, or persons who use, sell or possess narcotics, or have been disapproved for service as radio operators aboard merchant vessels of the United States in time of war, or have been issued a dishonorable discharge from the armed services of the United States.

Prior to the Act of May 12, 1948, appellants were radiotelegraph operators on board vessels of the United States Merchant Marine. Each applied for a license under the Act. When these were denied in October 1949 by a Board of Officers appointed to investigate appel-

---

1. 62 Stat. 232 (1948), 46 U.S.C. § 229a–229h (1958), 46 U.S.C.A. § 229a–229h.

2. § 3, 62 Stat. 233 (1948), 46 U.S.C. § 229c (1958), 46 U.S.C.A. § 229c. The office and functions of the board of local inspectors [designated "inspectors" above] pertaining to licensing and certifi-

cation were transferred to the Commandant of the United States Coast Guard. §§ 101–104, Reorganization Plan No. 3 of 1946, 11 Fed.Reg. 7875 (1946), 5 U.S. C.A. § 133y–16 note.

3. 46 C.F.R. § 10.13–17(d) (1) (1952).

4. 46 C.F.R. § 10.13–5 (Supp.1960).

lants, they dropped the matter until after the decision of the United States Court of Appeals in Parker v. Lester, 9 Cir., 1955, 227 F.2d 708, reversing D.C., 112 F.Supp. 433. This decision held invalid the procedures of the Coast Guard under the Magnuson Act [5] for screening seamen for employment in the Merchant Marine. Appellants then renewed their applications, which were again denied by reference to the previous denials. Homer and McCrea thereupon requested hearings, which were also denied, followed by these actions in the District Court.

After the actions were instituted the files respecting appellants were reviewed by another Board of Officers convened by the Commandant for the purpose. The Board made detailed findings, and concluded as to each appellant that the accumulative effect of the findings indicated appellants' untrustworthiness and that their character and habits of life were such as to warrant the conclusion they were not safe and suitable persons to be entrusted with the powers and duties of the position sought. In each case this conclusion was concurred in by the Commandant and each appellant was so informed by letter dated March 27, 1959.

As we have seen, a precise statutory qualification for a license as a radio-telegraph operator of any vessel is that he possess a valid first- or second-class radiotelegraph operator license issued by the Federal Communications Commission.[6] The validity of this provision is not questioned; nor is it questioned that Colcord did not have such a license. Accordingly, the judgment for the Commandant on the complaint of Colcord will be affirmed.

In the case of appellant McCrea the papers before the District Court on the motion for summary judgment included the letter to McCrea of March 27, 1959, which detailed the basis for the Commandant's action. The findings set forth in the letter include the following: that

McCrea had been discharged from employment with Bendix Aviation Company in 1941 because of Communist activities; that on three separate occasions he had received official reprimands from superior officers while himself serving in the capacity of ship's radio officer for reasons including intoxication, incompetence, and delaying the sailing time of a vessel; that he had given false and fraudulent answers in connection with his instant application and also in connection with an application for a commercial radio operator license in 1946; that he had given false testimony under oath in an official proceeding of the Federal Communications Commission; that he had been arrested and convicted for driving while drunk on two occasions, for drunkenness, and for maintaining and operating an unlicensed transmitter at Santa Anita in conjunction with confederates outside the race track in violation of section 301 of the Communications Act of 1934, 47 U.S.C.A. § 301; and that he had served with the Loyalist Forces in the Spanish Civil War for approximately one and one-half years as a member of the International Brigade. With respect to McCrea's activity in the Communist Party, the letter stated that he was an active member of the Party from 1936 to 1947, active in the recruitment of new members, and notwithstanding that in 1952 he advised representatives of a federal investigative agency that he and his wife had disassociated from affiliation with the Party after 1947, he continued to subscribe to various Communist publications and to have certain copies sent to homes of fellow employees. The letter stated that after a review of the foregoing the Commandant concurred in the action of the Board of Officers in denying McCrea's application.

With regard to appellant Homer, the Commandant's letter to him of March 27, 1959, stated that the Board of Officers convened to review and consider his application had found that for a period of

---

5. 64 Stat. 427 (1950), 50 U.S.C. §§ 191–194 (1958), 50 U.S.C.A. §§ 191–194.

6. § 3, 62 Stat. 233 (1948), 46 U.S.C. § 229c (1958), 46 U.S.C.A. § 229c.

at least ten years from 1936 to 1946 he was active in the Communist Party in the New York City area, including service as organizer of the Waterfront Section of the Party under the alias of Edward Phillips, and was employed as secretary of the Section; that he was in charge of a Communist school at Beacon, New York, prior to 1940; that he distributed copies of the "Daily Worker," the official organ of the Party; that it was reported that he was a leader of the "top fraction" of the Communist Party group in the American Radio Telegraphists Association; that prior to 1942 he advocated affiliation between the Association and the American League Against War and Fascism, and that information reflected that the latter served as a Communist front organization; that Homer's name appeared on a 1942 Communist Party nominating petition to have the organization's name placed on a state ballot in New York State; and that he was a dues-paying member of the Party as recently as February 1955. The Commandant's letter also referred to records of the Navy Department which indicated that in 1952 the Navy had disapproved Homer's continued employment as a commercial radio operator aboard United States vessels on the basis of a finding that he was suspected of engaging in un-American activities; that his wife had been active in the Communist Party both in New York City and Los Angeles from 1942 to 1958; and that his father-in-law, Max Steinberg, who resides with Homer, has devoted the greater portion of his life from the late 1920s to the present to activities in behalf of the Communist Party. The Commandant stated that he had personally reviewed the findings of fact and recommendations of the Board and concurred with the Board's conclusion that the accumulative effect of the stated information indicated Homer's untrustworthiness and that his character and habits of life are such that he is not a suitable person to be entrusted with the powers and duties of the position for which he desired to be licensed, for which reason his application was denied.

The Commandant, referring to Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, affirmed by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L. Ed. 1352, takes the position that McCrea and Homer have no constitutional right to the licenses and therefore his action, which precluded their employment as radiotelegraph operators on vessels of the Merchant Marine, has not deprived them of liberty or property without due process of law. In our view lack of a constitutional right to a license or to the positions sought does not solve the problem. The question should be stated as whether McCrea and Homer have been deprived of an employment opportunity in private industry by governmental action which does not meet the requirements of the Due Process Clause of the Fifth Amendment. One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.

The denial of appellants' applications for the licenses significantly curtailed their ability to follow an employment in which they had previously engaged. This was a curtailment of their liberty. See Allgeyer v. State of Louisiana, 165 U.S. 578, 589–590, 17 S.Ct. 427, 41 L.Ed. 832, and Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186, particularly the latter's reference to "the natural right to labor." There was perhaps at the same time a deprivation of a property interest. Greene v. McElroy, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed. 2d 1377, and cases there cited. And since the deprivation was by the United States it was not valid unless accomplished in a manner consistent with due process of law.

■ Whether or not due process was actually accorded need not be decided, however, if the screening program was not in any event authorized by Congress in the Act of May 12, 1948. The necessity for such authorization is not disputed. It will be remembered that in Greene the question was whether the President or Congress had authorized

the kind of security screening which resulted in Greene's loss of his engineering employment in private industry. The requisite authority was not found. In our case, however, Congress in directing the Commandant to pass on appellants' qualifications has said the Commandant must be satisfied that an applicant's "character, habits of life, and physical condition are such as to authorize the belief that he is a suitable and safe person to be entrusted with the powers and duties" of the position applied for. While Congress is not overly specific as to the meaning in the present context of "character," "habits of life," and "suitable and safe person," we would not be justified in holding these standards too vague to be administered. We think Congress has validly clothed the administrator with power to determine an applicant's character and habits in terms of the suitable and safe entrustment of responsibility to him as a radiotelegraph operator in the Merchant Marine. Other important public affairs are administered under statutory language no more precise, such as a finding of "public interest, convenience and necessity," or "restraint of trade," or "unfair methods of competition." While these examples do not relate to matters of individual liberty, they are, on the other hand, more indefinite than the criteria of the present statute. And see Parker v. Lester, supra.

Holding that screening authority exists we reach the question whether in the process of screening the Commandant is authorized to take into consideration Communist Party membership, associations or activities. See the Commandant's letters to McCrea and Homer of March 27, 1959, outlined supra. Such matters, together with charges of a different kind in the case of McCrea, led to "the accumulative effect" which in turn led to denial of the applications. The statute itself does not specify such ideological factors as among those which may be considered, nor do the Comman-

dant's regulations. Yet we think they may be considered. The case is not like Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403, or Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129, or Graham v. Richmond, 106 U.S.App. D.C. 288, 272 F.2d 517, where the administrator departed from applicable regulations. The Commandant has not done this. The regulations he has followed speak in terms like those of the statute in requiring applicants to establish "to the satisfaction of the Coast Guard that they possess all of the qualifications necessary, such as, age, experience, character and citizenship," [7] and in stating that the "application of any person may be rejected by the Commandant when derogatory information has been brought to his attention which indicates that the applicant's character and habits of life are such as to authorize the belief that he is not a suitable and safe person to be entrusted with the duties of radiotelegraph operator on any vessel." [8]

In view, especially at this period of our national life, of the sensitive nature of the positions involved—radiotelegraph operators on vessels of the Merchant Marine—positions closely associated with the nation's security, we think consideration of the ideological matters referred to is permitted under the statute; that is, we conclude Congress authorized the Commandant to consider them. This removes the case from the scope of Kent v. Dulles (Briehl v. Dulles), 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204, where the Court could not find a sufficiently clear congressional intent to impair freedom of association and belief. Impairment there is in our case, but one we think Congress has authorized. Accordingly, we must pass upon the validity of the impairment. We think it must be held valid. Parker v. Lester, supra, so held with respect to the screening of seamen for the Merchant Marine. And see Garner v. Board of Public Works, 341 U.S. 716, 720, 71 S.Ct.

7. 46 C.F.R. § 10.13–5(a) (1952).

8. 46 C.F.R. § 1013–17(d) (1) (1952).

924

909, 95 L.Ed. 1317; American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 398, 70 S.Ct. 674, 94 L.Ed. 925; Borrow v. Federal Communications Commission, 109 U.S.App.D.C. 224, 285 F.2d 666, certiorari denied 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188; Barenblatt v. United States, 360 U.S. 109, 128, 79 S.Ct. 1081, 3 L.Ed.2d 1115.[9] It is significant in this connection that Greene does not suggest that such ideological matters were there either irrelevant or barred from consideration because of the First Amendment; and Kent and Briehl did not turn on either the irrelevance or impermissible use of such information in connection with passport applications. They turned rather on the omission by Congress to authorize the Executive to consider such matters.

■ We return to the question of due process. Here a formidable difficulty faces the Commandant, of the sort passed upon in Parker v. Lester, and discussed in some of its aspects in Greene. The difficulty is that McCrea and Homer were not given a hearing or opportunity to meet the charges. It is true that since the March 27, 1959 letters of the Commandant, specifying the grounds for denial of the licenses, neither McCrea nor Homer has asked the Commandant for a hearing, as each previously had done. But in view of the history of these cases we are unwilling to say they can-

not have a hearing because they have not renewed their requests to the Commandant since March 27, 1959, especially in light of their insistence in the courts that they are entitled to a hearing.

The charges against them—that is, the reasons and findings of which they have been advised by the Commandant in his letters of March 27, 1959—are commingled in an "accumulative" conclusion reached by the Commandant. If hearings are requested the Commandant may afford McCrea and Homer an opportunity prior to the hearings to answer these varied charges, or such of them as are to be persisted in, so as if possible to limit or define the areas of factual dispute. And we do not preclude the possibility that as a result of the answers the Commandant may be in a position to make decisions without hearings.

Should either application in the end be denied the validity of the denial would depend upon whether the grounds finally relied upon are admitted or are established on reliable evidence, if after the answers evidence is found to be necessary, and upon whether the criteria of the Constitution as well as of the statute are met substantively and under procedures which afford the applicant an opportunity, consistently with due process of law, fairly to test the factual accuracy of the grounds upon which denial is placed.[10]

9. "[T]his Court in its constitutional adjudications has consistently refused to view the Communist Party as an ordinary political party, and has upheld federal legislation aimed at the Communist problem which in a different context would certainly have raised constitutional issues of the gravest character. See, e. g., Carlson v. Landon, 342 U.S. 524 [72 S.Ct. 525, 96 L.Ed. 547]; Galvan v. Press, 347 U.S. 522 [74 S.Ct. 737, 98 L.Ed. 911]. On the same premises this Court has upheld under the Fourteenth Amendment state legislation requiring those occupying or seeking public office to disclaim knowing membership in any organization advocating overthrow of the Government by force and violence, which legislation none can avoid seeing was aimed at membership in the Communist Party. See Gerende v. Board of Super-visors, 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745]; Garner v. Board of Public Works, 341 U.S. 716 [71 S.Ct. 909, 95 L.Ed. 1317]. See also Beilan v. Board of Public Education, 357 U.S. 399 [78 S.Ct. 1317, 2 L.Ed.2d 1414]; Lerner v. Casey, 357 U.S. 468 [78 S.Ct. 1311, 2 L.Ed.2d 1423]; Adler v. Board of Education, 342 U.S. 485 [72 S.Ct. 380, 96 L.Ed. 517]. Similarly, in other areas, this Court has recognized the close nexus between the Communist Party and violent overthrow of government. See Dennis v. United States, supra [341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137]; American Communications Ass'n, C. I. O. v. Douds, supra." 360 U.S. at page 128, 79 S.Ct. at page 1094.

10. In Greene v. McElroy, supra, it was held that Greene should not be denied

Affirmed as to Colcord. As to McCrea and Homer, reversed and remanded for proceedings not inconsistent with this opinion.

WASHINGTON, Circuit Judge, concurs, regarding himself as constrained to do so by the majority opinion, rendered over his dissent, in Borrow v. Federal Communications Commission, 109 U.S. App.D.C. 224, 285 F.2d 666, certiorari denied 1960, 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188.

Washington, Circuit Judge, dissented.

the right to confront and cross-examine witnesses unless the President or Congress had authorized clearance procedures which dispensed with these traditional safeguards. The Court left open the question whether in the circumstances of the case had such authorization been given the procedure would have met constitutional standards. We deem it unnecessary to discuss the problem of confrontation and cross-examination in relation to the case now before us, as the problem may not arise on remand, or, if it does, may be answered in a manner not inconsistent with the holding in Greene v. McElroy.