CAFETERIA & RESTAURANT WORKERS UNION,
LOCAL 473, AFL–CIO, ET AL. *v.*
McELROY ET AL.

No. 97.   Argued January 12, 1961.—
Decided June 19, 1961.

*Bernard Dunau* argued the cause and filed a brief for petitioners.

*John F. Davis* argued the cause for respondents. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Yeagley, Bruce J. Terris, Kevin T. Maroney* and *Lee B. Anderson.*

*J. Albert Woll, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

Mr. Justice Stewart delivered the opinion of the Court.

In 1956 the petitioner Rachel Brawner was a short-order cook at a cafeteria operated by her employer, M & M Restaurants, Inc., on the premises of the Naval Gun Factory [1] in the city of Washington. She had worked there for more than six years, and from her employer's point of view her record was entirely satisfactory.

The Gun Factory was engaged in designing, producing, and inspecting naval ordnance, including the development of weapons systems of a highly classified nature. Located on property owned by the United States, the installation was under the command of Rear Admiral D. M. Tyree, Superintendent. Access to it was restricted, and guards were posted at all points of entry. Identification badges were issued to persons authorized to enter the premises by the Security Officer, a naval officer subordinate to the Superintendent. In 1956 the Security Officer was Lieutenant Commander H. C. Williams. Rachel Brawner had been issued such a badge.

---

[1] The name of the Naval Gun Factory has now been officially changed to Naval Weapons Plant. It will be referred to as the "Gun Factory" in this opinion.

888

The cafeteria where she worked was operated by M & M under a contract with the Board of Governors of the Gun Factory. Section 5 (b) of the contract provided:

". . . In no event shall the Concessionaire engage, or continue to engage, for operations under this Agreement, personnel who

.        .        .        .        .

"(iii) fail to meet the security requirements or other requirements under applicable regulations of the Activity, as determined by the Security Officer of the Activity."

On November 15, 1956, Mrs. Brawner was required to turn in her identification badge because of Lieutenant Commander Williams' determination that she had failed to meet the security requirements of the installation. The Security Officer's determination was subsequently approved by Admiral Tyree, who cited § 5 (b) (iii) of the contract as the basis for his action. At the request of the petitioner Union, which represented the employees at the cafeteria, M & M sought to arrange a meeting with officials of the Gun Factory "for the purpose of a hearing regarding the denial of admittance to the Naval Gun Factory of Rachel Brawner." This request was denied by Admiral Tyree on the ground that such a meeting would "serve no useful purpose."

Since the day her identification badge was withdrawn Mrs. Brawner has not been permitted to enter the Gun Factory. M & M offered to employ her in another restaurant which the company operated in the suburban Washington area, but she refused on the ground that the location was inconvenient.

The petitioners brought this action in the District Court against the Secretary of Defense, Admiral Tyree, and Lieutenant Commander Williams, in their individual and official capacities, seeking, among other things, to

compel the return to Mrs. Brawner of her identification badge, so that she might be permitted to enter the Gun Factory and resume her former employment. The defendants filed a motion for summary judgment, supported by various affidavits and exhibits. The motion was granted and the complaint dismissed by the District Court. This judgment was affirmed by the Court of Appeals for the District of Columbia, sitting *en banc.* Four judges dissented.[2] We granted certiorari because of an alleged conflict between the Court of Appeals' decision and *Greene* v. *McElroy,* 360 U. S. 474. 364 U. S. 813.

As the case comes here, two basic questions are presented. Was the commanding officer of the Gun Factory authorized to deny Rachel Brawner access to the installation in the way he did? If he was so authorized, did his action in excluding her operate to deprive her of any right secured to her by the Constitution?

## I.

In *Greene* v. *McElroy, supra,* the Court was unwilling to find, in the absence of explicit authorization, that an aeronautical engineer, employed by a private contractor on private property, could be barred from following his profession by governmental revocation of his security clearance without according him the right to confront and cross-examine hostile witnesses. The Court in that case found that neither the Congress nor the President had explicitly authorized the procedure which had been followed in denying Greene access to classified information. Accordingly we did not reach the constitutional issues

---

[2] The appeal was originally heard by a panel of three judges, and the District Court's judgment was reversed, one judge dissenting. After rehearing *en banc,* the original opinion was withdrawn, and the District Court's judgment was affirmed. 109 U. S. App. D. C. 39, 284 F. 2d 173.

890

which that case otherwise would have presented. We proceed on the premise that the explicit authorization found wanting in *Greene* must be shown in the present case, putting to one side the Government's argument that the differing circumstances here justify less rigorous standards for measuring delegation of authority.

It cannot be doubted that both the legislative and executive branches are wholly legitimate potential sources of such explicit authority. The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President. Article I, § 8, of the Constitution gives Congress the power to "provide and maintain a navy;" to "make rules for the government and regulation of the land and naval forces;" to "exercise exclusive legislation . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings;" and to "make all laws which shall be necessary and proper for carrying into execution the foregoing powers . . . ." Broad power in this same area is also vested in the President by Article II, § 2, which makes him the Commander in Chief of the Armed Forces.

Congress has provided that the Secretary of the Navy "shall administer the Department of the Navy" and shall have "custody and charge of all . . . property of the Department." 10 U. S. C. § 5031 (a) and (c). In administering his Department, the Secretary has been given statutory power to "prescribe regulations, not inconsistent with law, for the government of his department, . . . and the custody, use, and preservation of the . . . property appertaining to it." 5 U. S. C. § 22. The law explicitly requires that United States Navy Regulations shall be approved by the President, 10 U. S. C. § 6011, and the pertinent regulations in effect when Rachel Brawner's identification badge was revoked had, in fact, been

expressly approved by President Truman on August 9, 1948.

The requirement of presidential approval of Navy regulations is of ancient vintage.[3] The significance of such presidential approval has often been recognized by this Court. *Smith* v. *Whitney,* 116 U. S. 167, 181; *Johnson* v. *Sayre,* 158 U. S. 109, 117; *United States Grain Corp.* v. *Phillips,* 261 U. S. 106, 109; *Denby* v. *Berry,* 263 U. S. 29, 37.[4] We may take it as settled that Navy Regulations approved by the President are, in the words of Chief Justice Marshall, endowed with "the sanction of the law." *United States* v. *Maurice,* 2 Brock. 96, 105.[5] And we find no room for substantial doubt that the Navy Regulations in effect on November 15, 1956, explicitly conferred upon Admiral Tyree the power summarily to deny Rachel Brawner access to the Gun Factory.

Article 0701 of the Regulations delineates the traditional responsibilities and duties of a commanding officer. It provides in part as follows:

> "The responsibility of the commanding officer for his command is absolute, except when, and to the extent, relieved therefrom by competent authority, or as provided otherwise in these regulations. The authority of the commanding officer is commensurate with his responsibility, subject to the limitations prescribed by law and these regulations. . . ."

---

[3] See R. S. § 1547 (1875) which was derived from the Act of July 14, 1862, c. 164, § 5, 12 Stat. 565. See also the Act of April 24, 1816, c. 69, § 9, 3 Stat. 298; the Act of March 3, 1813, c. 52, § 5, 2 Stat. 819.

[4] See also 25 Op. Atty. Gen. 270.

[5] The absence of presidential approval was relied upon in one case as a basis for finding certain administrative action unauthorized. See *Phillips* v. *United States Grain Corp.,* 279 F. 244, 248–249, rev'd on other grounds, 261 U. S. 106. See also 25 Op. Atty. Gen. 270, 275.

Article 0734 of the Regulations provides:

"In general, dealers or tradesmen or their agents shall not be admitted within a command, except as authorized by the commanding officer:

"1. To conduct public business.

"2. To transact specific private business with individuals at the request of the latter.

"3. To furnish services and supplies which are necessary and are not otherwise, or are insufficiently, available to the personnel of the command."

It would be difficult to conceive of a more specific conferral of power upon a commanding officer, in the exercise of his traditional command responsibility, to exclude from the area of his command a person in Rachel Brawner's status. Even without the benefit of the illuminating gloss of history, it could hardly be doubted that the phrase "tradesmen or their agents" covered her status as an employee of M & M with explicit precision.[6] But the meaning of the regulation need not be determined *in vacuo.* It is the verbalization of the unquestioned authority which commanding officers of military installations have exercised throughout our history.[7]

An opinion by Attorney General Butler in 1837 discloses that the power of a military commanding officer to exclude at will persons who earned their living by working on military bases was even then of long standing.

---

[6] A tradesman has been defined by Webster as "a shopkeeper; also, one of his employees." Webster, New International Dictionary (Second Edition, Unabridged, 1958), 2684.

[7] The contrast with the history of the security program involved in *Greene* v. *McElroy* is striking. There it was pointed out that "[p]rior to World War II, only sporadic efforts were made to control the clearance of persons who worked in private establishments which manufactured materials for national defense." 360 U. S., at 493.

Speaking of the Superintendent of the Military Academy, the Attorney General's opinion stated:

> "[H]e has always regarded the citizens resident within the public limits—such as the sutler, keeper of the commons, tailor, shoemaker, artificers, etc., even though they own houses on the public grounds, or occupy buildings belonging to the United States . . . —as *tenants at will,* and liable to be removed whenever, in the opinion of the superintendent, the interests of the academy require it. 'This,' he observes, 'has been the practice since I have been in command; and such, I am told, was the usage under the administration of my predecessors.'" 3 Op. Atty. Gen. 268, 269.

This power has been expressly recognized many times. "The power of a military commandant over a reservation is necessarily extensive and practically exclusive, forbidding entrance and controlling residence as the public interest may demand." 26 Op. Atty. Gen. 91, 92. "[I]t is well settled that a post commander can, in his discretion, exclude all persons other than those belonging to his post from post and reservation grounds." JAGA 1904/16272, 6 May 1904. "It is well settled that a Post Commander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline (1918 Dig. Op. J. A. G. 267 and cases cited)." JAGA 1925/680.44, 6 October 1925.

Under the explicit authority of Article 0734 of the Navy Regulations, and in the light of the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command, there can

remain no serious doubt of Admiral Tyree's authority to exclude Rachel Brawner from the Gun Factory upon the Security Officer's determination that she failed to meet the "security requirements . . . of the Activity." Her admittance to the installation in the first place was permissible, in the commanding officer's discretion, only because she came within the exception to the general rule of exclusion contained in the third paragraph of Article 0734 of the Regulations. And the plain words of Article 0734 made absolute the commanding officer's power to withdraw her permission to enter the Gun Factory at any time.

## II.

The question remains whether Admiral Tyree's action in summarily denying Rachel Brawner access to the site of her former employment violated the requirements of the Due Process Clause of the Fifth Amendment. This question cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place, she was not deprived of liberty or property by the Superintendent's action. "One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law." *Homer* v. *Richmond,* 110 U. S. App. D. C. 226, 229, 292 F. 2d 719, 722. It is the petitioners' claim that due process in this case required that Rachel Brawner be advised of the specific grounds for her exclusion and be accorded a hearing at which she might refute them. We are satisfied, however, that under the circumstances of this case such a procedure was not constitutionally required.

The Fifth Amendment does not require a trial-type hearing in every conceivable case of government impairment of private interest. "For, though 'due process of

law' generally implies and includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, . . . yet, this is not universally true." *Murray's Lessee* v. *Hoboken Land and Improvement Co.,* 18 How. 272, 280. The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. *Communications Comm'n* v. *WJR,* 337 U. S. 265, 275–276; *Hannah* v. *Larche,* 363 U. S. 420, 440, 442; *Hagar* v. *Reclamation District No. 108,* 111 U. S. 701, 708–709. " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." It is "compounded of history, reason, the past course of decisions . . . ." *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 162–163 (concurring opinion).

As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. Where it has been possible to characterize that private interest (perhaps in oversimplification) [8] as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required. *Oceanic Navigation Co.* v. *Stranahan,* 214 U. S. 320, 340–343; *Knauff* v. *Shaughnessy,* 338 U. S. 537; *Jay* v. *Boyd,* 351 U. S. 345, 354–358; cf. *Buttfield* v. *Stranahan,* 192 U. S. 470, 497.

What, then, was the private interest affected by Admiral Tyree's action in the present case? It most assuredly was not the right to follow a chosen trade or

---

[8] See Davis, The Requirement of a Trial-Type Hearing, 70 Harv. L. Rev. 193, 222–224.

profession. Cf. *Dent* v. *West Virginia,* 129 U. S. 114; *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *Truax* v. *Raich,* 239 U. S. 33. Rachel Brawner remained entirely free to obtain employment as a short-order cook or to get any other job, either with M & M or with any other employer. All that was denied her was the opportunity to work at one isolated and specific military installation.

Moreover, the governmental function operating here was not the power to regulate or license, as lawmaker, an entire trade or profession, or to control an entire branch of private business, but, rather, as proprietor, to manage the internal operation of an important federal military establishment. See *People* v. *Crane,* 214 N. Y. 154, 167–169, 108 N. E. 427, 431–432 (per Cardozo, J.) ; cf. *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 129. In that proprietary military capacity, the Federal Government, as has been pointed out, has traditionally exercised unfettered control.

Thus, the nature both of the private interest which has been impaired and the governmental power which has been exercised makes this case quite different from that of the lawyer in *Schware, supra,* the physician in *Dent, supra,* and the cook in *Raich, supra.* This case, like *Perkins* v. *Lukens `Steel Co.,* 310 U. S. 113, involves the Federal Government's dispatch of its own internal affairs. The Court has consistently recognized that an interest closely analogous to Rachel Brawner's, the interest of a government employee in retaining his job, can be summarily denied. It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer. *In the Matter of Hennen,* 13 Pet. 230, 246, 259; *Crenshaw* v. *United States,* 134 U. S. 99, 108; *Parsons* v. *United States,* 167 U. S. 324, 331–334; *Keim* v. *United States,* 177 U. S. 290, 293–294; *Taylor and Marshall* v. *Beckham* (*No. 1*), 178 U. S. 548, 575–578. This principle was

reaffirmed quite recently in *Vitarelli* v. *Seaton,* 359 U. S. 535. There we pointed out that Vitarelli, an Interior Department employee who had not qualified for statutory protection under the Civil Service Act, "could have been summarily discharged by the Secretary at any time without the giving of a reason . . . ." 359 U. S., at 539.

It is argued that this view of Rachel Brawner's interest is inconsistent with our decisions in *United Public Workers* v. *Mitchell,* 330 U. S. 75, and *Wieman* v. *Updegraff,* 344 U. S. 183. In those two cases an individual's interest in government employment was recognized as entitled to constitutional protection, and it is contended that what the Court said in deciding them would require us to hold that Rachel Brawner was entitled to notice and hearing in this case. In *United Public Workers* the Court observed that "[n]one would deny" that "Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.' " 330 U. S., at 100. In *Wieman* the Court held unconstitutional a statute which excluded persons from state employment solely on the basis of membership in alleged "Communist-front" or "subversive" organizations, regardless of their knowledge concerning the activities and purposes of the organizations to which they had belonged. In the course of its decision the Court said, "We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." 344 U. S., at 192.

Nothing that was said or decided in *United Public Workers* or *Wieman* would lead to the conclusion that Rachel Brawner could not be denied access to the Gun Factory without notice and an opportunity to be heard. Those cases demonstrate only that the state and federal

governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. But to acknowledge that there exist constitutional restraints upon state and federal governments in dealing with their employees is not to say that all such employees have a constitutional right to notice and a hearing before they can be removed. We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist. It does not follow, however, that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract with M & M.

Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity. See *Wieman* v. *Updegraff,* 344 U. S. 183, 190–191; *Joint Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 140–141; cf. *Bailey* v. *Richardson,* 86 U. S. App. D. C. 248, 182 F. 2d 46, aff'd by an equally divided Court, 341 U. S. 918.[9] All this record shows is that, in the opinion of the Security Officer of the Gun Factory, concurred in by the Superintendent, Rachel Brawner failed to meet the particular security requirements of that specific military installation. There is nothing to indicate that this determination would in any way impair Rachel Brawner's employment opportunities

---

[9] Compare Davis, The Requirement of a Trial-Type Hearing, 70 Harv. L. Rev. 193, 229–230, and Note, The Supreme Court, 1950 Term, 65 Harv. L. Rev. 107, 156–158, with Richardson, Problems in the Removal of Federal Civil Servants, 54 Mich. L. Rev. 219, 240–241.

anywhere else.[10]   As pointed out by Judge Prettyman, speaking for the Court of Appeals, "Nobody has said that Brawner is disloyal or is suspected of the slightest shadow of intentional wrongdoing. 'Security requirements' at such an installation, like such requirements under many other circumstances, cover many matters other than loyalty." 109 U. S. App. D. C., at 49, 284 F. 2d, at 183. For all that appears, the Security Officer and the Superintendent may have simply thought that Rachel Brawner was garrulous, or careless with her identification badge.

For these reasons, we conclude that the Due Process Clause of the Fifth Amendment was not violated in this case.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

I have grave doubts whether the removal of petitioner's identification badge for "security reasons" without notice of charges or opportunity to refute them was authorized by statute or executive order.   See *Greene* v. *McElroy,* 360 U. S. 474 (1959).   But under compulsion of the Court's determination that there was authority, I pass to a consideration of the more important constitutional issue, whether petitioner has been deprived of liberty or property without due process of law in violation of the Fifth Amendment.

I read the Court's opinion to acknowledge that petitioner's status as an employee at the Gun Factory was an interest of sufficient definiteness to be protected by the

---

[10] In oral argument government counsel emphatically represented that denial of access to the Gun Factory would not "by law or in fact" prevent Rachel Brawner from obtaining employment on any other federal property.

Federal Constitution from some kinds of governmental injury. Indeed, this acknowledgment seems compelled by our cases. *Wieman* v. *Updegraff,* 344 U. S. 183, (1952); *United Public Workers* v. *Mitchell,* 330 U. S. 75, 100 (1947) (*dictum*); *Torcaso* v. *Watkins, ante,* p. 488, decided today. In other words, if petitioner Brawner's badge had been lifted avowedly on grounds of her race, religion, or political opinions, the Court would concede that some constitutionally protected interest—whether "liberty" or "property" it is unnecessary to state—had been injured. But, as the Court says, there has been no such open discrimination here. The expressed ground of exclusion was the obscuring formulation that petitioner failed to meet the "security requirements" of the naval installation where she worked. I assume for present purposes that separation as a "security risk," if the charge is properly established, is not unconstitutional. But the Court goes beyond that. It holds that the mere assertion by government that exclusion is for a valid reason forecloses further inquiry. That is, unless the government official is foolish enough to admit what he is doing—and few will be so foolish after today's decision—he may employ "security requirements" as a blind behind which to dismiss at will for the most discriminatory of causes.

Such a result in effect nullifies the substantive right—not to be arbitrarily injured by Government—which the Court purports to recognize. What sort of right is it which enjoys absolutely no procedural protection? I do not mean to imply that petitioner could not have been excluded from the installation without the full procedural panoply of first having been subjected to a trial, with cross-examination and confrontation of accusers, and proof of guilt beyond a reasonable doubt. I need not go so far in this case. For under today's holding petitioner is entitled to no process at all. She is not told what she

did wrong; she is not given a chance to defend herself. She may be the victim of the basest calumny, perhaps even the caprice of the government officials in whose power her status rested completely. In such a case, I cannot believe that she is not entitled to some procedures. "[T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 168 (1951) (concurring opinion.) See also *Homer* v. *Richmond,* 110 U. S. App. D. C. 226, 292 F. 2d 719 (1961); *Parker* v. *Lester,* 227 F. 2d 708 (C. A. 9th Cir. 1955). In sum, the Court holds that petitioner has a right not to have her identification badge taken away for an "arbitrary" reason, but no right to be told in detail what the reason is, or to defend her own innocence, in order to show, perhaps, that the true reason for deprivation was one forbidden by the Constitution. That is an internal contradiction to which I cannot subscribe.

One further circumstance makes this particularly a case where procedural requirements of fairness are essential. Petitioner was not simply excluded from the base summarily, without a notice and chance to defend herself. She was excluded as a "security risk," that designation most odious in our times. The Court consoles itself with the speculation that she may have been merely garrulous, or careless with her identification badge, and indeed she might, although she will never find out. But, in the common understanding of the public with whom petitioner must hereafter live and work, the term "security risk" carries a much more sinister meaning. See *Beilan* v. *Board of Public Education,* 357 U. S. 399, 421–423 (1958) (dissenting opinion). It is far more likely to be taken as an accusation of communism or disloyalty than impu-

tation of some small personal fault. Perhaps the Government has reasons for lumping such a multitude of sins under a misleading term. But it ought not to affix a "badge of infamy," *Wieman* v. *Updegraff, supra,* at 191, to a person without some statement of charges, and some opportunity to speak in reply.

It may be, of course, that petitioner was justly excluded from the Gun Factory. But, in my view, it is fundamentally unfair, and therefore violative of the Due Process Clause of the Fifth Amendment, to deprive her of a valuable relationship so summarily.