OPINION OF THE COURT
Robert J. Stolarik, J.
This is an action for declaratory judgment. Plaintiffs, all members of the Suffern High School hockey team, were suspended from that competition for a period of six weeks following an investigation which concerned certain violations of training rules. Plaintiffs contend that these suspensions were violative of the plaintiffs’ rights under section 3214 of the Education Law of the State of New York, and in violation of their rights to due process pursuant to the Constitutions of the United States and of the State of New York. Plaintiffs seek a judgment declaring the suspensions herein unlawful and illegal.
*933 During the course of the trial, 13 plaintiffs withdrew from the action. Accordingly, this decision will only be applicable to the plaintiffs, Stevens, Savarese and Nevóle.
The events which precipitated the action by the school authorities began on January 25, 1980 when the Suffern High School hockey team journeyed to Saratoga, New York, where they were to play two games against local teams. In addition to the team and the coach, several parents of team members made the trip. Following the game on that evening (a Friday night) the coach allowed the team members to go out for dinner with instructions to return to the motel by 11 o’clock. After 11 o’clock, there was a bed check and another about midnight, when the team members were told to remain in their rooms and put their lights out. Sometime after this second bed check, the coach heard a door close and his decision to check that occurrence led to his discovery that some of the team were smoking marihuana and others drinking beer. The coach then instructed the team captains to bring the team out into the hallway where, after admonishing them to tell the truth in rather strong terms, he asked each team member if he had smoked or drank beer and each one of them admitted that they had done one or the other, except one, whose denials were confirmed by the other team members. After this episode, the team members returned to their rooms and, during the night, the coach had further discussions with the team captains and at least one of the parents (who told the coach he would like to be part of the decision-making process). In the morning he telephoned the athletic director of the high school and the incident was reported to that office. A decision was also made at that time to play the remaining game that day and to take up the matter reported on the following Monday morning. The coach also met with parents that morning, during which discussion he advised them of the events which took place during the night, the possible penalty involved and the fact that the incident had been reported to school authorities. Over the weekend, the athletic director discussed the matter with the assistant principals and several of the team members advised their parents of what took place upon their return home. On *934 Monday morning, the principal, Mr. Charles Neff, met with the assistant principals, the athletic director and the hockey coach. They discussed what had happened and devised a procedure whereby each boy would be called into the principal’s office alone and asked four questions: Did they smoke? Did they drink? Did they participate in providing the beer? Who should be exonerated? Each of the boys acknowledged his involvement (such as it was) and exonerated the one boy who disclaimed any involvement. After each boy was interviewed he was brought to another room where he waited until all the team members were there and for Mr. Neff, who, upon his arrival, advised the boys of his appreciation for their frankness and co-operation, reminded them of the rules, told them that the incident would be reported to the school board and that his decision would be forthcoming. Another team member who was not in school that afternoon was called on the telephone by an assistant principal and, being asked the same four questions as the other young men, acknowledged his involvement in the beer drinking episode. The following day, the principal called the team together, advised them of his decision and handed each of them a written notice of suspension. After school that day, Mr. Neff was confronted by one of the parents who advised him that he wanted to be part of the decision, to which the principal offered the advice that he could not be, in that he was not part of the administration of the school. The next morning, five parents went to the school to see Mr. Neff. They indicated they were representing all of the parents and offered the principal some alternatives to the penalty imposed which Mr. Neff indicated he would consider and advise them of his decision. There was further contact with Mr. Neff after that and, finally, on February 7, 1980, he called the parent who was the spokesman for the group and advised him that his original decision would stand. It should also be noted that in conjunction with the athletic program at Suffern High School, there is a requirement that each participant agree to a set of training rules regarding the use of alcoholic beverages, tobacco and drugs. The prohibited areas are clearly spelled out, as are the penalties attached to violation of each training rule. The document is signed by the *935 participants and, in the instant case, each of the plaintiffs indicated they not only signed the training rules, but that the coach had read the rules to them prior to signing and that they understood their import.
The complaint alleges a violation of the requirements of section 3214 of the Education Law of the State of New York. This section deals with the suspension of public school students from attendance at school. The suspension in the instant matter is from an extracurricular activity and, accordingly, the court finds that this statute is not applicable to the situation at hand and denies the application for a declaratory judgment on this ground.
With regard to plaintiffs’ contention that they have been denied their constitutional right to due process, plaintiffs have presented no clear authority that the question they present is properly before the court. Participation in a varsity sports program would seem to fall within the category of privilege and, clearly, such participation does not rise to the level of a right or even a protected property interest. Plaintiffs present no applicable precedent that a privilege of this nature is constitutionally protected. Considering, however, that there is no clear authority to the contrary, and without deciding that the principles of due process are applicable to suspensions from extracurricular activities and, being mindful of the traditional reluctance of the courts to interfere with the operation of the public school system (Epperson v Arkansas, 393 US 97), the court will address itself to the question of what process is due.
We recognize at the outset that the application of the due process requirement is not a constant, structured procedure, and that “[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.” (Cafeteria Workers v McElroy, 367 US 886, 895.) This concept is particularly adaptable to the school setting which not only provides a background for a wide range of possible infractions committed under an even wider range of possible circumstances, but also involves a constant balancing of individual interests versus the broader interest of school authorities in maintaining discipline as a vital ingredient *936 in the educational process, in the disposition of these infractions. Minor infractions can be (and most often are) handled with dispatch, with a minimum of formality, but the procedures involving more serious breaches of discipline to which more severe penalties attach, undoubtedly lend themselves to a more stringent adherence to the principles of due process. But in every case where the concept of due process is involved, it is generally recognized that the fundamental requisite of due process of law is the opportunity to be heard. (Grannis v Ordean, 234 US 385.) There must be some fundamentally fair proceeding to determine wrongdoing or, put in another way, some kind of notice, some kind of hearing.
In the case at hand, there is no question that the team members involved had sufficient notice of the nature of the complaint regarding their activities on the evening of January 25-26, 1980; Not only did the coach make it abundantly clear that his displeasure was rooted in possible violations of the training rules, but the testimony of the team members clearly indicates that they understood bhe nature of the complaint against them. Given the opportunity for an immediate hearing, they admitted to the coach that they had violated the training rules (in one form or another). More importantly, the procedure which the principal employed the following morning not only involved a fair statement of the complaint, but again, a fair opportunity to be heard, at which time the team members admitted their implication. It is suggested that perhaps the parents should have been “notified”, or that some type of “hearing” should have been conducted. When one considers a situation where there was an immediate confrontation between the coach and the team members and, considering the procedures adopted by the principal the following Monday morning, which resulted in admissions on the part of all the team members (except one, whose freedom from involvement was confirmed by his teammates), the necessity of a formal hearing is clearly obviated and the involvement of the parents even less meaningful. Indeed, it is clear from the record in this case that the parents frankly acknowledge the wrongdoing of their sons and, apparently, had no quarrel with the “pro *937 cedural due process” as it developed in this case but their single complaint is that the penalty is too severe. Even the parents who felt they should be part of the “decision making process” only wanted their input felt and considered in the dispositional phase of the proceedings.
The court finds that the team members involved not only received adequate notice, but were afforded an adequate opportunity to be heard and, accordingly, were afforded due process. It is abundantly clear from the record herein that the team members, by their own testimony, frankly acknowledge that they knew that the complaint against them involved specific violations of the training rules and, given the opportunity to be heard, they admitted to the violations. Some of them had their parents present with them on the road trip, most of the team advised their parents of what occurred when they arrived home over the weekend and all of them were afforded the additional opportunity of speaking to the principal (through their parents) and having him reconsider his decision. The court finds that the procedures adopted were fundamentally fair and appropriate to the circumstances involved.
The complaint is dismissed.