Wilford and Maxine LEWIS, Sylvester and Bertha Brown, Grace Cato, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

Carla A. HILLS, Secretary of the United States Department of Housing and Urban Development, et al.

Civ. A. No. 76–1662.

United States District Court, E. D. Pennsylvania.

July 21, 1978.

George D. Gould, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Stephanie P. Lachman, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

DITTER, District Judge.

The question presented in this case is whether defendants' refusal to afford an oral, evidentiary hearing to plaintiffs claiming certain benefits under the National Housing Act (Act) amounts to a due process violation under the Fifth Amendment. Although I conclude that plaintiffs have a property interest in these benefits so that due process protections apply, I also find that the government's interest in providing for the efficient administration and processing of these claims far outweighs plaintiffs' interest and their requests for evidentiary hearings should be denied. Therefore, defendants' motion for summary judgment must be granted.

Plaintiffs[1] originated this class action[2] challenging the procedures used by the defendants (hereinafter HUD, the Secretary, or the government) in processing claims for benefits under Sections 518(b) and (d) of the National Housing Act, 12 U.S.C. §§ 1735b(b), (d). Plaintiffs seek an order enjoining HUD from refusing to give claimants under these sections an oral, evidentiary hearing before an impartial hearing examiner to challenge the denial of their claims. They also request that, prior to this hearing, they be given access to the HUD file pertaining to the individual claim and, at the hearing, they be permitted to be represented by counsel, have witnesses testify in their own behalf, and confront and cross-examine adverse witnesses including those who conducted inspections or were involved in the processing of their claim. In addition, plaintiffs ask that the hearing examiner provide them with a written decision based only upon evidence submitted at the hearing.

I. *The Procedural and Factual Background*

a. Section 518

Section 518(b) of the National Housing Act, 12 U.S.C. § 1735b(b), authorizes the Secretary to make expenditures to correct, or reimburse the owner for certain defects in a dwelling covered by a mortgage insured under either Section 203, 221, or 235 of the Act. To be eligible for benefits, the home must have been more than one year old on the date the mortgage insurance commitment was issued, it must be a one to four-family dwelling unit, the defect must have existed on the date of the insurance commitment, and the defect must have been one which a proper appraisal inspection could reasonably be expected to have disclosed. Most importantly, it must have been a structural defect or one which so seriously affected use and livability as to create a serious danger to the life and safety of the inhabitants of the home.[3] Section 518(d) of the Act, 12 U.S.C. § 1735b(d), affords essentially the same coverage as Section 518(b), although it applies only to those mortgages issued after January 1, 1973, and prior to August 3, 1976. These claims must have been filed by August 3, 1977.

b. The Claims Procedure

A total reiteration of the complicated procedure prescribed by the Secretary for

1. By stipulation of counsel, plaintiffs Sylvester and Bertha Brown were voluntarily dismissed from this action.

2. This court, pursuant to stipulation of counsel, declared this matter a class action on September 9, 1976.
 ". . . all owners of homes within the jurisdiction of the HUD Philadelphia Area Office which are insured under either Section 203, 221 or 235 of the National Housing Act, and who have or will file a claim with HUD under Section 518(b) or (d) of the National Housing Act, which claim has been or will be denied without opportunity for an oral evidentiary administrative appeal hearing."

3. As originally enacted, Section 518(b) covered only single-family dwellings insured under Section 235 of the Act, the section which established a home ownership assistance program for low and moderate income families. This coverage was extended by the 1974 Housing and Community Development Act, P.L. 93–383, 88 Stat. 678, to owners of existing dwellings insured under Sections 203 and 221 of the Act (dwellings located in older, declining urban areas), and also to two-family homes insured under Section 235. In addition, it narrowed the standard to which the defect must comply by adding the ". . . as to create a serious danger to the life or safety . . ." language. This section has been amended twice since then. First, Section 302 of the Emergency Housing Act of 1975, P.L. 94–50, 89 Stat. 249, expanded the eligible class of homeowners to include the owners of three and four-family insured homes and extended the time for filing claims. Finally, the Housing Authorization Act of 1976, P.L. 94–375, 90 Stat. 1067, further extended the cutoff date for filing Section 518(b) claims. As the Act now stands, Section 518(b) claimants who are insured under Section 235 must request relief within one year after the mortgage is insured; if these claimants are insured under Sections 203 or 221, the mortgage must have been insured between August 1, 1968, and January 1, 1973, and assistance must have been requested by December 3, 1976.

processing claims [4] is unnecessary. In summary, however, once a claim is filed it is initially reviewed by the HUD area office. Assuming that the claim is not rejected for failing to meet the eligibility requirements,[5] the HUD case binder on the property is reviewed to see what conditions may be eligible for correction. The original appraisal report [6] is examined to discover whether defects were noted, what repairs to the dwelling were originally required to insure the mortgage, and whether subsequent inspections were made to discover if the repairs were accomplished. For those defects claimed by the homeowner but not specified in the appraisal, the HUD office is charged with judging whether or not the defect existed on the date of the appraisal inspection. Following this preliminary review, the HUD Valuation Section dispatches to the property an inspector who renders a report summarizing any statement by the homeowners and his own conclusions as to the claimed defects. This report is reviewed by the chief appraiser and then forwarded to the branch chief (here, the Chief of Single Family Mortgages) for a "final" determination. The claimant is then notified by letter the extent to which his claim is eligible [7] or ineligible for benefits.

This is by no means the end of the process, however. At the homeowner's request, within 30 days, reconsideration of any of the disallowed claims can be had. The case file is returned to the local HUD office for a second review and, in many cases, a second inspection of the property. The area office director reviews these findings, and if he agrees with the original decision, the case is sent to the HUD regional office for a last review.

### c. The Named Plaintiffs

Wilford and Maxine Lewis purchased their home in Philadelphia, on November 26, 1969, with a mortgage insured under Section 221 of the National Housing Act. Although settlement was held, they were unable to move into the home because of its allegedly defective condition. They lived instead in an apartment until July, 1970. Thereafter, from July, 1970, thru November, 1971, the Lewises lived in a parent's home across the street from the building at issue, while making continuous visits to their home to insure that it was not being vandalized. In September, 1975,[8] they filed a Section 518(b) claim requesting reimbursement for 53 items.[9] All claims were disapproved by letter dated March 23, 1976. The next day, plaintiffs' counsel wrote to the HUD Regional Counsel, seeking an oral,

---

4. The current standards and procedures promulgated by HUD are found in Chapter 3, "Construction Complaints Handbook," HPMA–FHA Handbook 4070.1 Rev.Chg. (Handbook).

5. If it is, the homeowner is notified by letter that the claim is denied and that reconsideration is possible if additional information is provided.

6. Before a FHA commitment was issued to a mortgagee, HUD made a valuation estimate which disclosed the maximum mortgage available for a property. This estimate required an appraisal inspection to determine whether repairs, replacements, alterations, or additions were necessary to meet HUD's Minimum Property Standards and to preserve the property's economic and physical soundness. The primary purpose of the appraisal inspection is to assure the United States of adequate security for the mortgage. Affidavit of George O. Hipps, Jr., at paragraphs 9 and 10.

7. If eligible, the letter will specify the amount to be reimbursed and advise the claimant that a

contract for repairs should be made within 90 days. Additional considerations are accorded those homeowners who cannot obtain a contractor within the cost limit awarded by HUD, or those who must temporarily vacate the dwelling while repairs are being made. If the defect is beyond repair, consideration may be given to disposing of the building and acquiring another residence.

8. There is no positive indication from the complaint or plaintiffs' brief that they have lived in the dwelling from November, 1971, to the present, but for the purpose of this decision, I shall assume they did so.

9. Among the defects noted were: (a) a non-functioning heating system; (b) cracked and leaking sewer line; (c) hazardous electrical wiring; (d) a defective roof; (e) decayed rear porch floor, columns and roof; (f) substandard plumbing, and (g) rotten and deteriorated windows and window frames.

evidentiary hearing, a request which was denied. The Lewises also asked that they be given the opportunity to inspect and copy their Section 518(b) file. This request was refused and plaintiffs were notified that this information could only be secured through a Freedom of Information Act request. In addition, plaintiffs' counsel was denied the right to inspect the file personally. On April 14, 1976, the Lewises appealed under existing HUD procedures the denial of their claim.[10]

Plaintiff Grace Cato purchased her home in Philadelphia, on September 30, 1969, with her parents under a Section 221 mortgage. On March 2, 1976, she filed a Section 518(b) claim, listing at least nine serious defects in the property. Complaint, Exhibit H. As, with the Lewises, every item was rejected as being ineligible for consideration. She also requested an oral, evidentiary hearing, which was denied, and she appealed the denial of her claim through established HUD channels.[11]

## II. *The Alleged Deprivation of Due Process Rights*[12]

The Supreme Court has set out a two-step process for determining whether there has been a deprivation of procedural due process. First, it must be ascertained whether there is a property interest at issue and, if so, whether due process protections attach. Second, if the interest is a protected one, it must be determined how much process is constitutionally due. *Goss v. Lopez*, 419 U.S. 565, 577, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Supreme Court elaborated on the nature of the interest needed to invoke due process protection:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

---

10. Plaintiffs' counsel has been notified that, through the discovery process, the Regional Office has decided five items in the Lewises' favor, although plaintiffs have not received written verification of this determination. See Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at page 13; Affidavit of Victor F. Kaminski, at paragraph 11.

It is also interesting to note that the Lewis' property was one of 13 dwellings specifically noted by Wright Patman, Chairman of the House Committee on Banking and Currency, in a letter to then HUD Secretary George Romney, dated July 28, 1970, in which Congressman Patman commented on the administration of FHA low and moderate income housing programs. Mr. Patman stated that if the 13 homes in Philadelphia and those examined in Washington, D.C., as a part of a preliminary investigation were typical of the rest of the nation, then the operation of the programs constituted the "probable existence of a national scandal of the most sordid type." Complaint, Exhibit B.

11. Apparently, three items claimed on the Cato property have been made or will be made eligible for benefits. See Kaminski Affidavit, at paragraph 23.

12. Initially, it must be noted that this court has subject matter jurisdiction, based on 28 U.S.C. § 1337, in that the National Housing Act of 1959 is a statute regulating commerce. *Davis v. Romney*, 490 F.2d 1360, 1365–66 (3d Cir. 1974).

Had plaintiffs brought this action seeking a review of the Secretary's decision in denying benefits, then jurisdiction clearly would not exist by virtue of 12 U.S.C. § 1735b(c), which provides:

The Secretary shall by regulations prescribe the terms and conditions under which expenditures and payments may be made under the provisions of this section, and decisions regarding such expenditures or payments, and the terms and conditions under which the same are approved or disapproved, shall be final and conclusive and *shall not be subject to judicial review* (emphasis added).

However, plaintiffs' complaint does not seek individual review; rather, it alleges a deprivation of plaintiffs' constitutional and statutory rights.

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

See also *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077–78, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The interpretation and application of the due process clause is an intense and practical matter and "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

Plaintiffs' contention that their claim applications are entitled to due process protection is based on three grounds. First, they assert that Sections 518(b) and (d) were enacted by Congress to provide repair and compensation for the correction of major defects which should have been detected when a property was inspected for its FHA mortgage commitment. The legislation is remedial, designed to reimburse the victims of abuses discovered in the Section 235 program, citing *Bailey v. Romney,* 359 F.Supp. 596, 601 (D.D.C.1973). Second, plaintiffs point out that the statute delineates specific and detailed criteria in terms of type, nature and existence of the defect, date of the mortgage insurance, location and type of home, and date of claim. Thus, plaintiffs maintain the statute creates a legitimate expectancy that benefits will not be denied unless HUD determines factually that the claimant has not met the criteria. Finally, plaintiffs point to a number of cases which have held that although claimants for governmental benefits may not have been declared eligible for those benefits as yet,

they are still entitled to due process safeguards so long as the claim is "grounded in the statute defining eligibility . . . ." *Board of Regents v. Roth,* supra, 408 U.S. at 577, 92 S.Ct. at 2709.

■ While plaintiffs' contention is logical and persuasive, it must also be recognized that by aiding low income persons to become homeowners, the government did not bind itself to guarantee that the homes were in perfect condition. That the Lewises and Catos might have to make repairs to their homes would seem logical in light of the fact they purchased four-bedroom dwellings for under $10,000. Plaintiffs have no constitutional right to be homeowners, nor do they have a constitutional right to flawless homes at government expense. *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972); *United States v. Neustadt,* 366 U.S. 696, 709, 81 S.Ct. 1294, 1301–02, 6 L.Ed.2d 614 (1961). With this by way of background, the government counters with a two-part argument.

■■ First, it contends that due process protections attach only in those situations where the claim is one of a continuing benefit upon which claimants rely for the necessities of life, such as welfare, and not to a one-time payment for the correction of structural defects in a home. I cannot agree. The due process clause does not come into play only when there is a deprivation of a basic sustenance payment or severe detriment or grievous loss. Rather, in determining "whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake," *Board of Regents v. Roth,* supra, 408 U.S. at 570–571, 92 S.Ct. at 2705–06, and "as long as a property deprivation is not *de minimus,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Goss v. Lopez,* supra, 419 U.S. at 576, 95 S.Ct. at 737.[13]

---

**13.** In *Pence v. Kleppe,* 529 F.2d 135 (9th Cir. 1976), the Ninth Circuit held that the Alaskan Native Allotment Act, which authorized the Secretary of the Interior to grant up to 160

acres of vacant, unreserved public land to native Alaskans who could demonstrate a continuous occupancy and use of the land for five years before applying for the grant, created a

Second, the government relies on the unreported decision in *Metropolitan Area Housing Alliance v. Patricia Harris,* Civil Action No. 76–992 (N.D.Ill., filed May 31, 1977) (*MAHA*), which considered issues quite similar to those addressed here[14] and seriously questioned whether Section 518(b) claimants can claim a legitimate entitlement to benefits under the program. In *MAHA,* Judge McGarr found that whatever interest was created under Section 518(b), "the procedures for the processing of § 518(b) claims set forth in the HUD Handbook 4070.1 satisfy the minimum requirements of due process for protection . ." *Id.,* slip op. at 13.[15] Thus, the court was not forced to decide whether claimants had a property interest. However, after considering the opening words to Section 518(b), i. e., "The Secretary is authorized to make expenditures . . .," Judge McGarr further held

> . . . the statute, though clearly defining eligibility for a benefit, vests such discretion in the Secretary of HUD in establishing the terms and conditions under which such benefits may be paid as to seriously call into question the § 518(b) claimants' legitimate entitlement thereto. *Id.,* slip op. at 13.

Plaintiffs submit that the district court was in error in construing "authorized" to confer upon HUD a discretionary function, and contend that the statute when read as a whole, indicates a legislative intent to impose a mandatory duty.

The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that guides us when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed. Care must be taken, however, to respect the limits up to which Congress was prepared to enact a particular policy, especially when the boundaries of a statute are drawn as a compromise resulting from the countervailing pressures of other policies. *United States v. Sisson,* 399 U.S. 267, 297–98, 90 S.Ct. 2117, 2133–34, 26 L.Ed.2d 608 (1970). See also *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Even in the case where "may" is part of the statutory language, congressional intent respecting the Secretary's administrative authority in this area should not be ignored.

"May" ordinarily connotes discretion, but neither in lay nor legal understanding is the result inexorable. Rather, the conclusion to be reached "depends on the context of the statute, and on whether it is fairly to be presumed that it was the intention of the legislature to confer a discretionary power or to impose an imperative duty" (footnotes omitted). *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 355, 408 F.2d 154, 158 (1968), quoting *United States ex rel. Siegel v. Thoman,* 156 U.S. 353, 359, 15 S.Ct. 378, 39 L.Ed. 450 (1895).

In this regard, the legislative history of Section 518(b) reveals a strong congressional concern for the plight of low-income persons who purchase federally insured homes with major structural defects. It is on this basis that I find the likely probability that Congress imposed upon the Secre-

---

property interest to which due process applies. The government attempts to distinguish this case on the basis that the "continuous use and occupancy of the land" requirement transforms the claim into one of a continuous nature. But it is more evident that the continuous test was just one of the statutory requirements for entitlement and once the claimants had so occupied, their claim was grounded in the statute defining eligibility and they could receive due process safeguards. This case is, as plaintiffs assert, another example of a one-time grant of benefits.

14. In *MAHA,* plaintiffs asserted that defendants [HUD] in administering the program did not provide claimants with the opportunity to examine HUD records in regard to their claims nor were they given a chance to participate in a fair hearing with counsel on their claims. They also complained of a lack of a written statement of the evidence and rules relied on in denying a claim, and that claims were not decided within a reasonable time.

15. This aspect of *MAHA* is considered in Part III of this opinion, *infra.*

tary a nondiscretionary obligation to confer these benefits and to afford claimants a nonarbitrary determination of the merits of their claims. Due process protections should therefore attach.[16]

The question remains as to what process is due.

III. *HUD procedures for processing Section 518(b) claims satisfy the minimum requirements of due process for protection of plaintiffs' property interest*

 Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," *Cafeteria & Restaurant Workers,* supra, 367 U.S. at 895, 81 S.Ct. at 1748. It "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* supra, 408 U.S. at 481, 92 S.Ct. at 2600. Resolution of the issue whether the procedures provided in this instance are sufficient requires an analysis of the governmental and private interests that are affected, *Arnett v. Kennedy,* 416 U.S. 134, 167–168, 94 S.Ct. 1633, 1650–51, 40 L.Ed.2d 15 (1974); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Both sides agree that the three-factor test set out in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), is applicable to determine what due process is required:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional, or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335, 96 S.Ct. at 903.

After considering these three factors, I conclude that no further due process protections are required.

a. The private interest.

Despite the government's arguments that there is only a loss of a one-time benefit and there is no deprivation upon which plaintiffs have come to rely, such as a loss of welfare or social security benefits, the interest to plaintiffs is quite substantial. The very fact that the defect must "so seriously affect use and livability as to create a serious danger to the life or safety of inhabitants" demonstrates the acute interest plaintiffs have in remedying any such defect.

b. The risk of erroneous deprivation through the procedures used.

Having considered the contentions of the parties, I find that the risk of erroneous deprivation is neither as minimal as the government asserts nor as great as suggested by plaintiffs.

The government maintains that when a claim is made there are only two questions: whether a structural or other serious defect existed in the home at the time the insurance commitment was issued and, if so, whether a proper inspection prior thereto could reasonably have been expected to reveal the defect. Thus, it asserts the issue relates to physical facts ascertainable by a trained property inspector. The homeowner has the opportunity to submit oral evidence because the inspection carried out pursuant to 518(b) claim procedures takes place in his presence and his comments are invited. He is also given the opportunity to submit a written report on all defects. Should the claim be denied initially and reconsideration requested, the entire record is sent to the HUD regional office. At that time, additional information may be solicit-

16. In *Abrams v. Hills,* 547 F.2d 1062, 1067–68 (9th Cir. 1976), cert. granted sub nom. *Harris v. Abrams,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), the Secretary's contention that she had complete discretion in determining whether to implement an "operating subsidy" program under the Housing and Community Development Act of 1974 was rejected. The language of the section creating the Secretary's obligation was couched in the same precatory terms as is at issue here: "The Secretary *is authorized* to make and contract to make, additional assistance payments . . ." (emphasis added). 12 U.S.C. § 1715z–1(f)(3).

ed of the homeowner, there may be a request for additional documentation, and there may be a second physical inspection of the dwelling. According to the September 17, 1976, change (Transmittal No. 7) to the handbook, ¶ 3–10a(6), with respect to defects which have not been corrected, homeowners are also to be given the benefit of the doubt that these defects existed at the time of the original appraisal. On this basis, the government argues that there would be no value to any additional procedural safeguards.

Plaintiffs, on the other hand, argue that bias against this program within HUD demonstrates a very great risk of erroneous deprivation through the procedures set up by the Handbook, and that an oral, evidentiary hearing, confrontation, and cross-examination are mandated. They contest the reliability of original appraisal reports issued at the time of the mortgage commitment for a number of reasons. First, these reports do not contain an item by item analysis of the property. Second, Congress implemented the Section 518(b) program in part because of a failure of some FHA inspectors to report substantial defects. Finally, there have been a number of criminal convictions of persons who submitted false certifications to HUD regarding the condition of homes and whether repairs had been properly made. Deposition of Herbert L. Goldberg, at p. 37. Plaintiffs also contend that the reliability of 518(b) inspection reports is tainted because most of the personnel who performed the original reports are now making subsequent inspections on Section 518(b) claims. This is not totally accurate, however. Present staff members who served as appraisers of homes with respect to which Section 518(b) claims are filed do not participate in the later inspection, Kaminski Affidavit, at paragraph 25, although they may participate in the processing of the claims in some manner. Goldberg Deposition, at pp. 97–99.[17]

The second phase of plaintiffs' argument involves the issue of credibility and veracity. A defect will be compensable only if it existed at the time of insurance commitment and was discoverable at that point. HUD must evaluate this possibility by questioning the applicant and viewing the property. But it is exceedingly difficult to view a property some years after its purchase and determine if a defect, whether still existing or repaired, was present at the time of purchase.[18] This, plaintiffs contend, makes the claimants' reliability crucial to an evaluation of the claim, and oral statements given to the inspector, or the right to submit further information in writing, will not provide to HUD a basis for judging claimants' credibility. Therefore, plaintiffs say an oral, evidentiary hearing with the right to confront and to cross-examine is necessary.

---

**17.** The combination of investigative and adjudicative functions does not necessarily create an unconstitutional risk of bias in an administrative proceeding. One must overcome a presumption of honesty and integrity in those who are serving as adjudicators and it must be established

 under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

**18.** For instance, Senator John G. Tower of Texas has remarked:

 I cannot imagine how one could determine if a defect existed 4 years ago. Would the purchaser have the burden of proof that the defect existed when FHA made the original appraisal, or would FHA have the burden of proving the contrary? How difficult would it be to determine if a minor problem, which had not been repaired, in fact was the cause of a structural defect that manifested itself well after the inspection? And to what degree of difficulty do we encounter when we try to define structural defect. 119 Cong. Rec. 25127 (1973).

 Little but luck or good fortune are likely to distinguish those who make out a claim from those who do not. It will be almost impossible to determine the validity of a particular claim. St.Rep.No.93–693, 93d Cong., 2d Sess. at 166, 1974 U.S.Code and Admin. News, pp. 4273, 4430–31 (1974).

Although I am sympathetic to plaintiffs' arguments, I must agree with the conclusion reached by the courts in *MAHA*, supra, slip op. at 13–14, and *Bailey v. Romney*, supra, 359 F.Supp. at 603, that there is no need for an adjudicatory hearing. Admittedly, since neither court engaged in a *Mathews v. Eldridge* type analysis, the precedential value of these decisions is somewhat diminished. However, it is evident that the procedures established by HUD afford Section 518(b) claimants an adequate opportunity to present their positions and to appeal from an initial denial. Each claim can potentially receive review on three levels, and in each instance, a report or a recommendation is produced. The claimant is notified of defects determined to be ineligible and reconsideration can be requested. In addition, the property is inspected at least once and may be inspected a second time in order to give the claimant the benefit of any doubt.

Nevertheless, no matter how favorable I could be to plaintiffs' position on these first two issues, the tremendous administrative burden which would be imposed upon HUD if the requests for hearings were granted outweigh plaintiffs' interests and shifts the balance in favor of the government.

c. The government's interest far outweighs plaintiffs' interest.

In arriving at the appropriate due process balance the final factor to be assessed is the public interest. "This includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right," an oral, evidentiary hearing prior to any denial of the claimed benefits under Section 518(b). *Mathews v. Eldridge,* supra, 424 U.S. at 347, 96 S.Ct. at 909. Of course, the most apparent burden would be the increased time and cost resulting from the need to appoint impartial hearing examiners, obtain transcripts, and prepare written decisions. In addition, there would be the loss of time by appraisers, inspectors and staff personnel who otherwise would be involved with the processing of other claims, as well as the costs involved in scheduling meetings and arranging for hearing rooms. In addition, in some of the more busy regional offices, such as Philadelphia, there might be a need to hire additional personnel to fill the gap created by those who would have to attend these hearings.

Even if I were to adopt the most conservative figures submitted by plaintiffs,[19] I would still conclude that the ultimate additional cost in terms of money and manpower would be substantial for three reasons. First, although the data plaintiffs use may be correct, their argument as to the corresponding time which will be consumed in holding the hearings totally ignores reality. It is naive to state that a hearing of the magnitude plaintiffs desire will take at best one hour of additional administrative time. One need only consider the number of personnel who are involved in deciding a 518(b) claim to reach the conclusion that the time spent in cross-examining them would surpass one hour. Add to that the testimony of the claimant and the arguments of counsel who, with due deference, are never brief, and it can be seen that any hearing becomes lengthy. This does not take into account the clerical time spent in arranging the hearings or the time the hearing officer will take in preparing a report and decision for the homeowner. Finally, when inspectors' time is considered, the government's estimate that each proceeding would amount to four and one-half hours is far more realistic. Therefore, even using the minimal figures, plaintiffs' request would constitute at least 3,000 additional hours of administrative time on the Philadelphia of-

19. By December 31, 1976, 76,375 claims for benefits under the Section 518(b) program were received nationwide, 38,874 of which were determined invalid. Of that number, 9,508 requests for reconsideration were received in the Philadelphia Area Office. Plaintiffs argue that only 9,508 hearings would be required, therefore, and only 764 in Philadelphia. HUD counters by contending that the administrative burden should be measured by considering the number of claims ruled invalid for which there was no reconsideration desired, i. e., 29,366 (38,874 − 9,508).

fice alone. Aside from the monetary costs involved, one can imagine the resulting disruption upon office efficiency. Second, the above calculations do not take into account the Section 518(d) program, for which plaintiffs also demand a hearing. The extension of that program to owners of homes encumbered by mortgages insured under Sections 203 and 221 between January 1, 1973, and August 3, 1976, enlarges the number of potential claimants by 585,343. The processing of these claims is still at a very early stage, so the cost of providing hearings to those seeking reconsideration cannot be estimated. Amended Affidavit of George O. Hipps, Jr., at paragraph 27. Nevertheless, the resulting administrative burden would be substantial.

Finally, I must be aware of the precedential effect of any ruling which would impose additional financial burdens on HUD. As I stated previously, it is obvious that Congress is concerned about the low-income housing problems in this country. Although the 518(b) program, as it applies to Section 203 and Section 221 insured mortgages, has expired, see note 3, supra, another similar-type program may be enacted. For example, the opportunity to apply for Section 235 mortgages was extended by Congress to September 30, 1978, see Section 301(d) of the "Housing and Community Development Act of 1977," P.L. 95–128, 91 Stat. pp. 1111, 1131. Moreover, a decision for plaintiffs here would no doubt be used by claimants pressing for this type of relief in other areas of the country. Therefore, my consideration cannot be confined to a consideration of the here-and-now impact, but must also take into account the there-and-then ripples.

Justice Powell's dictum in *Mathews v. Eldridge,* supra is particularly instructive:

> Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard to some administrative decision.

But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources, is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost. Significantly, the cost of protecting those whom the preliminary administrative process has identified as likely to be found undeserving may in the end come out of the pockets of the deserving since resources available for any particular program of social welfare are not unlimited. *Id.* at 348, 96 S.Ct. at 909.

For these reasons, HUD's interest in maintaining its present procedures far outweighs the private interest of plaintiffs.

### IV. *Conclusion*

Although I have concluded that plaintiffs' interests in their Section 518(b) claims are of sufficient magnitude to rise to the level of a property interest, for which procedural due process protections apply, their request for relief for an oral, evidentiary hearing, the hearing transcripts, the right to have counsel present, and to confront and cross-examine all HUD personnel who participated in the decision denying their claims are simply too much when one considers the absolutely awesome administrative burden that would result should the relief be granted. The effect on the Philadelphia office alone would be extremely taxing, and any ruling in favor of plaintiffs would probably be utilized not only nationwide but also in the future by claimants desiring additional administrative safeguards.

However, this decision should not be read to imply that HUD's procedures are letter-perfect. Certain concessions have been made by the government during the course of this proceeding [20] and although it is pres-

---

**20.** One of plaintiffs' requests was that they be permitted to obtain copies of documents in their HUD files without having to first file a request under the Freedom of Information Act. During oral argument, I expressed concern over this particular procedure. A revised procedure has been implemented and homeowners may file either written requests for the documents or personally inspect and copy them at the area office.

ently sufficient, I would urge HUD to improve its manner of informing claimants of the reasons for claim denials.