The GRAY PANTHERS et al., Plaintiffs,

v.

Joseph CALIFANO, Jr., Secretary,
Department of Health, Education
and Welfare, Defendant.

Civ. A. No. 77–488.

United States District Court,
District of Columbia.

March 6, 1979.

Edward C. King and Toby S. Edelman, National Senior Citizens Law Center, Washington, D. C., Sally Hart Wilson (argued case before the court), Gill Deford, Neal S. Dudovitz, Karen Jones, National Senior Citizens Law Center, Los Angeles, Cal., for plaintiffs.

Eugene Tillman, Dept. of Health, Ed. and Welfare, Washington, D. C., for defendant;

A. Patricia Frohman, Asst. U. S. Atty., Civil Division, Washington, D. C., of counsel.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiffs present a two-pronged challenge to the constitutionality of Sections 1869(b)(2) and 1842(b)(3)(C) of the Social Security Act, codified at 42 U.S.C. §§ 1395ff(b)(2) and 1395u(b)(3)(C), which limit the right to an oral, evidentiary hearing on appeal under Title XVIII of the Act, 42 U.S.C. § 1395 *et seq.*, commonly known as the "Medicare" program, to those beneficiaries making claims in which the matter in controversy is $100 or more. First, the plaintiffs allege that the amount-in-controversy requirement deprives persons whose disputed claims involve less than $100 of their property without due process in violation of the Fifth Amendment. Second, the plaintiffs contend that the $100 limitation denies them the equal protection of the laws guaranteed by the Fifth Amendment.

There are no disputed issues as to any material fact in this action and the court properly may decide this controversy under Rule 56. For the reasons set forth below, the court will deny the plaintiffs' motion for summary judgment and will enter summary judgment for the defendant.

### I.

The plaintiffs assail the constitutional adequacy of the procedural protections afforded beneficiaries appealing adverse decisions on claims of less than $100 under Parts A and B of the Medicare program. Part A covers primarily institutional care, such as hospitalization and nursing home services, while Part B covers supplementary medical benefits, such as doctors' fees and physical therapy. The Medicare program is not a comprehensive health program. The statute specifically excludes certain categories of health services from coverage, *see, e.*

*g.,* 42 U.S.C. § 1395y. In addition, it imposes certain general qualifications upon the services that are covered, *see, e. g.,* 42 U.S.C. §§ 1395y, 1395u(b)(3). Consequently, many claims for reimbursement for medical services provided to beneficiaries either are denied or reduced by the reviewing body.

Reimbursement to providers for services rendered to beneficiaries is carried out either by the Secretary of Health, Education and Welfare, or, more commonly, by private insurance companies, called intermediaries or carriers, who have contracted with the Department of Health, Education and Welfare pursuant to 42 U.S.C. § 1395h to perform that function under its direction. Beneficiaries who have been denied benefits under either component of the Medicare program are entitled to appeal the adverse decision. 42 C.F.R. § 405.710 *et seq.* (Part A); 42 C.F.R. § 405.807 *et seq.* (Part B). In their initial stages, the prescribed appeal procedures are substantially the same for the two parts. The carrier provides the claimant with notice of the initial determination, which states the reasons for an adverse decision and informs him of the right to review. The claimant is given the opportunity to submit written evidence and argument and to have the claim reviewed by a different decisionmaker than the one involved in the initial determination. After a reexamination of the claim on "reconsideration" (Part A) or "review" (Part B), a beneficiary who remains dissatisfied with the disposition of his claim may request an oral, evidentiary hearing,[1] but only if the amount at issue is $100 or more. 42 U.S.C. § 1395ff(b)(2), 42 C.F.R. § 405.720(d) (Part A); 42 U.S.C. § 1395u(b)(3)(C), 42 C.F.R. § 405.820(a) (Part B). Under Part A, the eligible claimant is entitled to a hearing before an administrative law judge, 42 C.F.R. § 405.720 *et seq.,* and may obtain judicial review of the hearing determination where the amount in controversy is $1,000 or more. 42 U.S.C. § 1395ff(b)(2); 42 C.F.R. § 405.730. In a claim arising under Part B, the evidentiary hearing is conducted by the carrier, 42 C.F.R. § 405.-820 *et seq.,* and there is no provision for judicial review.

The named plaintiffs in this action are the Gray Panthers, an organization that claims to represent the interests of the elderly throughout the United States, and three individuals who are enrolled in Parts A and B of the Medicare program. In addition, the court has certified a class of plaintiffs consisting of all persons who have been denied oral, evidentiary hearings on Medicare claims of less than $100 within the year immediately preceding the filing of this lawsuit, or who will be denied such hearings while this suit is pending. There is no dispute as to the events giving rise to this litigation. Each of the individual plaintiffs submitted a claim or claims to his carrier for physician services, which are covered by Part B. The carriers determined that some of the services were unnecessary and that charges for some of the other services were not reasonable, and reduced payments accordingly. Following an initial adverse determination, the plaintiffs submitted their claims for review pursuant to 42 C.F.R. § 405.807 *et seq.* Each plaintiff, dissatisfied with a second adverse determination under the review procedure, requested an oral, evidentiary hearing before his carrier. In each case, the carrier refused to grant a hearing, because the amounts in controversy at the time of the requests were less than $100 for each plaintiff. The carriers expressly based their refusals upon the statutory preclusion of 42 U.S.C. § 1395u(b)(3)(C). The plaintiffs then brought this suit, asking the court to require the defendant to provide them and each of the class members with oral, evidentiary hearings on their claims, and to order the defendant permanently to desist from applying the amount-in-controversy limitations of the challenged statutory provisions.

---

1. The hearings under both Parts A and B provide the claimant with an opportunity to present and cross-examine witnesses, although they do not conform in all respects to judicial procedures in the evidentiary and other areas. *See, e. g.,* 42 C.F.R. § 405.830 (conduct of hearings under Part B).

## II.

The plaintiffs contend that the due process clause of the Fifth Amendment requires the government to afford Medicare beneficiaries the opportunity for an oral, evidentiary hearing on their claims at some stage irrespective of the amount of Medicare benefits in controversy. The defendant does not contest the plaintiffs' assertion that a beneficiary's property interest in Medicare benefits is entitled to the protections of due process. Rather, the defendant argues that the existing administrative procedures for review of disputed claims of under $100, which rely solely upon written submissions, provide all the process that is constitutionally due to beneficiaries under the Medicare program. Upon consideration of the parties' arguments on this question, the court concludes that the amount-in-controversy limitation attacked here satisfies the due process guarantees of the Fifth Amendment.

█ The court is guided in its determination by certain fundamental precepts of due process jurisprudence articulated by the United States Supreme Court. Due process "'is not a technical conception with a fixed content unrelated to time, place and circumstances'." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). It is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In the area of social benefits programs, courts scrutinizing the government's compliance with due process must balance the public and private interests affected by a given procedural scheme. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 263–66, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Although "some kind of hearing is required at some time before a person is finally deprived of his property interests," *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), an oral, evidentiary hearing is not required in all cases. In a variety of situations where due process requirements are invoked, "something less than an evidentiary hearing" can satisfy the right to be heard. *Mathews v. Eldridge, supra*, 424 U.S. at 343, 96 S.Ct. at 907.

█ Both sides in the present case agree that the Supreme Court's decision in *Mathews v. Eldridge, supra*, is applicable to determine whether the Medicare review procedures challenged here pass constitutional muster.[2] The Court there enumerated three factors that courts engaged in a due process analysis must consider in evaluating the adequacy of a particular procedural scheme:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [citation omitted]

424 U.S. at 335, 96 S.Ct. at 903. The United States Court of Appeals for the District of Columbia Circuit has observed that courts are to balance these three factors, rather than treat one or another of the factors alone as dispositive. *Basel v. Knebel*, 179 U.S.App.D.C. 209, 212, 551 F.2d 395, 398 (1977). Mindful of this admonition, the court will assess the plaintiffs' due process claim in terms of the three-factor test set forth above.

---

2. At the oral hearing on the cross-motions for summary judgment, the plaintiffs sought to limit the precedential weight to be accorded to *Mathews v. Eldridge, supra,* on the ground that the plaintiffs in that case, unlike those in the case at bar, were entitled to an evidentiary hearing after the adverse administrative action. Other courts, however, see, e. g., *Lewis v. Hills,* 457 F.Supp. 1112 (E.D.Pa.1978), have not so limited the reach of *Mathews.* Similarly, this court does not believe that the Supreme Court's due process analysis applies with less force in situations where the aggrieved parties do not have a right to a post-termination hearing.

## A. *The Private Interest*

The private interest at issue in this case is a Medicare beneficiary's right to reimbursement for medical expenses covered under the Medicare program. The plaintiffs contend that this "property interest in Medicare benefits is critical because it relates directly to one of the necessities of life—health care."[3] Even though the sums at stake may be small, maintain the plaintiffs, the denial of benefits has a severe impact upon the affected claimants because of the disparity between the limited financial resources of the elderly and their great medical needs. The plaintiffs further argue that the private interest in the present case is stronger than that in *Mathews v. Eldridge, supra,* where the Supreme Court held that an evidentiary hearing is not required prior to the termination of Social Security disability payments, because the absence of post-termination review under the Medicare program means that a denial of benefits under the current appeal procedures will involve a permanent, rather than a temporary, deprivation of property.

■ Although the court recognizes that the denial of Medicare benefits undoubtedly does inflict genuine hardship upon some claimants, it does not believe that the private interest affected by the challenged Medicare procedures is such that the due process clause requires the defendant to provide all beneficiaries with the opportunity for an oral, evidentiary hearing. The Court in *Mathews* limited the holding of *Goldberg v. Kelly, supra,* which required the agency to provide welfare recipients with an evidentiary hearing before it terminated their public assistance benefits, to cases where the individual's interests in benefits is "based upon financial need." 424 U.S. at 340, 96 S.Ct. 893. Eligibility for Medicare benefits, unlike eligibility for public assistance benefits, is not based upon financial need. Nor is eligibility to participate in the Medicare program related to income or support. A decision denying reimbursement under the program, therefore, generally will not cause the degree of hard-

ship identified in cases involving the termination of welfare benefits. *See Goldberg v. Kelly, supra,* 397 U.S. at 264, 90 S.Ct. 1011.

The court notes, moreover, that the impact of the statutory denial of a right to an evidentiary hearing is mitigated by two factors. First, as the government emphasizes, even if Medicare benefits for specific services are denied on review or reconsideration, the beneficiary's eligibility for reimbursement of all other covered medical expenses continues uninterrupted. Second, the Medicare regulations provide for cumulation of claims to meet the amount-in-controversy requirement for evidentiary hearings, so long as all claims have been through the review or reconsideration process. 42 C.F.R. § 405.740 (Part A); 42 C.F.R. § 405.-820 (Part B). Thus, claimants are confronted with the possibility of a denial of benefits of less than $100 during a period of two months under Part A and six months under Part B after the opportunity for an appeal. If the total amount of denied claims ever reaches $100 within the specified period, the beneficiary is entitled to a full evidentiary hearing. In these circumstances, "something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Mathews v. Eldridge, supra,* 424 U.S. at 343, 96 S.Ct. at 907.

The court's conclusion is not altered by the fact that the plaintiffs in *Mathews,* denied a hearing before the termination of their disability benefits, still were entitled to a post-termination hearing on their claim. The potential deprivation in *Mathews,* even though subject to reversal at the post-termination proceeding, was of a much greater magnitude than that involved here. *See Mathews v. Eldridge, supra,* 424 U.S. at 341–42, 96 S.Ct. 893. Further, in other cases involving significant private interests, courts have held that procedures similar to those assailed in the present case satisfied due process, even where there was no provision for a subsequent hearing. *See, e. g., Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483

---

**3.** Memorandum in Support of Plaintiffs' Motion for Summary Judgment, pp. 11–12.

(9th Cir. 1974) (in action by the Federal Housing Administration to increase rent in federally financed low-income housing, tenants' due process rights were satisfied by notice of rent increase and the opportunity to make written objections); *Lewis v. Hills, supra* (due process rights of low-income persons threatened with loss of their property interest in repair benefits provided under the National Housing Act were satisfied by the opportunity to make written submissions contesting the adverse administration action).

### B. *Risk of Erroneous Deprivation under Current Procedures and Value of Additional Procedural Safeguard*

██ The second part of the three-fold inquiry articulated by the Supreme Court requires consideration of "the risk of an erroneous deprivation of [the individual's] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903. The plaintiffs argue that the risk of an erroneous deprivation of Medicare benefits under current review and reconsideration procedures is "extremely high" and that this risk can be reduced greatly by giving all Medicare beneficiaries the opportunity to obtain an evidentiary hearing on their claims. In the court's view, however, the degree of demonstrated risk is not so high that the present procedural scheme fails to afford due process to beneficiaries with claims of under $100. Moreover, the plaintiffs have failed to prove that the adoption of evidentiary hearings would improve significantly the reliability of the existing process for reviewing small claims.

The plaintiffs allege that the unreliability of the Medicare claims determination proc-

ess prior to the hearing stage is largely the result of the type of notice of an initial adverse determination received by beneficiaries.[4] They assert that the notice form is so cryptic, both in its statement of the reasons for a denial of benefits and in its instructions regarding the right to appeal, that many beneficiaries feel that it would be futile to seek review or reconsideration of a denial. Even when beneficiaries do appeal, argue the plaintiffs, "the reasons for claims denials given in the initial notice are so unclear [that] it is virtually impossible for the average beneficiary to present a well-reasoned argument to the insurance company . . . ."[5] To buttress their attack on the adequacy of the current prehearing review process, the plaintiffs submit statistics indicating that in 1974 and 1975 nearly 50% of the review and reconsideration decisions reexamined at evidentiary hearings were reversed.

The court is unable to agree with the plaintiffs that the "Explanation of Medicare Benefits," the form sent to beneficiaries notifying them of the reasons for any denial of benefits, is so obscurely worded that it denies claimants a meaningful opportunity for review of adverse initial determinations. Although the notations on the front side of the document are somewhat unclear, as the plaintiffs maintain, the reverse side of the form explains those notations, informs beneficiaries that they have a right to a review of the denial of their claims, and provides a telephone number beneficiaries may call if they have any questions or problems regarding the form. Other than a tentatively phrased observation contained in a study by the Medicare Administration,[6] no evidence has been proffered by the plaintiffs to suggest that the notice form discourages beneficiaries from

---

4. The plaintiffs also point to the large number of clerical and coding errors in claims determinations and contend that these errors contribute to the high risk of erroneous deprivation of benefits. The defendant does not dispute the high rate of clerical and coding errors at the largely computerized initial determination phase of the claims process but argues that such errors are easily spotted and corrected in the individualized review and reconsideration stage. As a result, the errors do not necessarily result in denials.

5. Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 15.

6. Quoted in *id.,* p. 22 n.21.

utilizing their right of appeal. Indeed, the plaintiffs themselves point out that there are "many reasons" why beneficiaries do not seek review or reconsideration, including "their advanced age, poor health . ., [and] confusion about the benefits to which they are entitled . . ."[7] Nor have the plaintiffs provided convincing evidence that the statement of reasons for the denial of a claim is so confusing that many beneficiaries cannot effectively present their cases on appeal. In the case at bar, each of the individually-named plaintiffs was sufficiently apprised of the grounds for denial of benefits by the notice provided to make a meaningful submission on review. Further, in many cases it is the treating physician who will submit a claim for reimbursement to the carrier and who will provide meaningful evidence on review or reconsideration of claims that are disallowed.

The plaintiffs' statistics on the reversal rate at Medicare hearings do not substantiate their claim that the review and reconsideration process is highly unreliable in correcting erroneous claims determinations. In organizing their data, the plaintiffs looked at the ratio between the number of times in which review and reconsideration decisions were reversed at evidentiary hearings and the number of hearings actually held.[8] By thus "focusing solely on the re-versal rate for appealed reconsideration [or review] determinations," however, the plaintiffs "overstate the relevant reversal rate." *Mathews v. Eldridge, supra,* 424 U.S. at 346 n. 29, 96 S.Ct. at 908. The Court in *Mathews* expressly rejected this statistical approach, explaining that

> in order fully to assess the reliability and fairness of a system of procedure, one must . . . consider the overall rate of error for all denials of benefits.

*Id.* (citing *Fusari v. Steinberg,* 419 U.S. 379, 383 n. 6, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975)). According to the government's figures, which the plaintiffs have not challenged, the ratio of reversals to all initial denials under Parts A and B yields an overall reversal rate for hearings of less than one-tenth of 1%.[9] This reversal rate is a small fraction of the 3.3% rate the Court in *Mathews* upheld as consistent with due process. *Id.*[10]

Even if the plaintiffs were able to demonstrate that current appeal procedures prior to the hearing stage present a high risk of erroneously depriving beneficiaries of their Medicare benefits, they have failed utterly to prove the potential value of an evidentiary hearing to the decisionmaker reviewing the denial of small claims. The Court in *Mathews* observed that "[c]entral to the evaluation of any administrative

---

**7.** *Id.,* p. 21.

**8.** In calculating the overall reversal rate for the total number of Medicare claims, the plaintiffs divided the number of reversals pro claimant by the number of hearings actually held. Bomberg Affidavit, ¶ 10. According to these data, the reversal rate for Part A hearings was 70.7% in 1974 and 67.0% in 1975; for Part B hearings the rate was 45.3% in 1974 and 42.3% in 1975. Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 24. The estimated overall reversal rate of approximately 50% is based upon an actual overall rate of 48.6%. Bomberg Affidavit, ¶ 11.

**9.** The defendant's figures show that the reversal rates for fiscal 1976 were .34% for Part A and 3.5% for Part B. Memorandum in Support of Defendant's Motion for Summary Judgment, p. 17 nn.14 & 15. Many of these reversals, however, took place at the review or reconsideration level, to which all claimants are entitled. Netting out such reversals, which is appropriate under *Mathews v. Eldridge, supra,*

424 U.S. at 346 n.29, 96 S.Ct. 893, the overall reversal rate for hearings in 1976 was .05% for Part A and .02% for Part B. *Id.,* p. 17 nn.16 & 17.

**10.** In their analysis of the weaknesses of the current procedural scheme, the plaintiffs also engage in a lengthy discussion of carrier cooperation with the Secretary's efforts to promote administrative efficiency and of the carrier's dual role as a Medicare agent and private insurance company. The relevance of this discussion to the issue before the court is obscure. To the extent the plaintiffs suggest that due process is violated by the use of carrier or intermediary employees as decisionmakers because of a putative conflict arising out of their dual role, that contention has been squarely rejected by the courts. *See, e. g., Chelsea Community Hospital v. Michigan Blue Cross Association,* 436 F.Supp. 1050 (E.D.Mich.1977); *Davis v. HEW,* 416 F.Supp. 448 (S.D.N.Y.1976).

process is the nature of the relevant inquiry." *Id.*, 424 U.S. at 343, 96 S.Ct. at 907. In order to receive reimbursement for medical services under Parts A and B, the beneficiary must establish that the services are covered by the statute and the regulations issued pursuant thereto. The plaintiffs nowhere explain how an oral presentation by the claimant would assist the reviewer in determining whether a denial or reduction of benefits was consistent with statutory restrictions on coverage.[11] They do not dispute the government's contention that review or reconsideration of denials frequently depends upon facts not within the knowledge or control of the claimant. In many cases, the reviewer will request information from the treating physician, who is more likely than the claimant to be familiar with the reasons for the initial adverse determination. The reviewer's decision in those cases often will turn upon "routine, standard, and unbiased medical reports by physician specialists," *Richardson v. Perales*, 402 U.S. 389, 404, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971), concerning a subject whom they personally have examined. In *Richardson*, the Court noted that routine doctors' reports do not present the "specter of questionable credibility and veracity." *Id.* at 407, 91 S.Ct. at 1430. Moreover, the government points out that the largest number of denials are "reasonable charge reductions," which typically turn upon mathematical calculations.[12] It appears, therefore, that "issues of witness credibility and veracity," those an oral hearing is best suited to resolve, are not "critical to the decisionmaking process" in "the generality of cases" in this area. *Mathews v. Eldridge, supra*, 424 U.S. at 344–45, 96 S.Ct. 893, 907. Although there may be some cases in which an evidentiary hearing would aid the reviewer, the decisions he must make usually are "sharply focused and easily documented," *id.* at 343, 96 S.Ct. 893, and the court feels that the nature of his inquiry is particularly suited to procedures that afford claimants the opportunity to make written submissions.

### C. *Public Interest*

The plaintiffs are unpersuasive in their efforts to rebut the defendant's contention that the extension of an opportunity for evidentiary hearings to all Medicare claims would impose an additional significant fiscal and administrative burden upon the Medicare program. In *Mathews v. Eldridge, supra*, the Court stated:

Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed.

*Id.* at 348, 96 S.Ct. at 909. The legislative history of the Medicare bill and subsequent amendments clearly reflects congressional concern over the potential costs of providing evidentiary hearings to beneficiaries with claims of under $100.[13] The parties

11. The plaintiffs do conjecture that the extension of hearing rights to all claimants could have a "watch dog" effect in encouraging greater attention to claims of under $100 at the initial level of review and reconsideration. Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 29. Although there may be some merit to this contention, the alleged collateral benefit does not respond to concerns outlined in the second part of the test set forth in *Mathews v. Eldridge, supra*.

12. Reimbursement for non-provider services under the Medicare program is based upon a statutorily prescribed formula which sets the upper limit at the 75th percentile of prevailing charges and limits annual increases through an economic index. 42 U.S.C. § 1395u(b)(3).

13. The amount-in-controversy requirement for hearings under Part A was enacted into law in 1965 as part of the Social Security Act after the House Conferees agreed to a Senate amendment to the Medicare Bill (H.R. 6675) that reduced the limitation from $1,000 to $100. *Conference Report*, H.R.Rep.No.682, 89th Cong., 1st Sess. 46 (1965). Senator Edward Kennedy, who proposed the amendment, referred explicitly to the cost of holding evidentiary hearings for review of claims denials under Part A. *See* 111 Cong.Rec. 15266 (1965). When Congress passed Section 1842(b)(3)(C) of the Social Security Act in 1965, it did not place any limitations upon the availability of evidentiary hearings for claims under Part B. In 1972, however, Congress amended Section 1842(b)(3)(C)

submit conflicting estimates of the cost of holding evidentiary hearings under the Medicare program,[14] as well as of the number of beneficiaries with claims of under $100 who would seek to exhaust this option if it were made available to them.[15] Under either of these estimates, it is clear that the aggregate additional cost in terms of money and administrative burden in implementing hearings for all claims would be substantial. The court, therefore, is constrained to conclude that the speculative benefit of a right to an oral, evidentiary hearing to persons with Medicare claims of less than $100 is outweighed by the cost to the public of requiring the additional procedural safeguard.

### III.

The plaintiffs also contend that 42 U.S.C. §§ 1395ff(b)(2) and 1395u(b)(3)(C) violate the equal protection guarantees incorporated into the Fifth Amendment by treating differently similarly circumstanced beneficiaries on the basis of the size of their Medicare claims. Further, they argue that the court should apply to the challenged classification a standard of equal protection review that is stricter than the traditional, deferential rational basis test, *see, e. g.,*

*Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The court cannot agree with either contention.

The plaintiffs rely upon three cases in which the Supreme Court applied a standard of review that is less stringent than so-called "strict scrutiny," *see, e. g., Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), but more demanding than traditional formulations of rational basis review. In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the classification struck down on equal protection grounds was based upon sex, while in *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) and *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), the statutory provisions invalidated by the Court discriminated against certain persons solely because of their illegitimacy. Despite the fact that the classification in each case arguably had some reasonable basis, *see, e. g., Reed v. Reed, supra,* 404 U.S. at 76, 92 S.Ct. 251, the Court invalidated all three of the schemes on the ground that they unconstitutionally had denied equal protection to particular classes of persons. The Court ruled in those cases that classifications based upon sex and illegitimacy

to require that a minimum amount of $100 be at issue before a beneficiary under Part B would be entitled to an evidentiary hearing before the carrier. Social Security Amendments of 1972, Pub.L.No.92–603, § 262(a). The Report of the Senate Finance Committee on the amendment clearly indicates that Congress was concerned about the drain upon fiscal resources resulting from the administration of "full fair hearing[s]" for a high number of small claims. *See* S.Rep.No.92–1230, 92d Cong., 2d Sess. 213 (1972).

**14.** The plaintiffs estimate the cost of a Part A hearing to be $302.80, George Affidavit, while the government sets the figure at $404.71, Memorandum in Support of Defendant's Motion for Summary Judgment, p. 20. According to the government, the cost of a Part B hearing ranges between $196 and $266, Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 26; the plaintiffs do not submit an independent estimate of the cost of hearings under Part B.

**15.** The plaintiffs argue that the administrative and fiscal burden of extending the opportunity for a hearing to all claimants will be lessened by the probable failure of beneficiaries to take advantage of the new appeal procedures. They note that few aggrieved beneficiaries with claims of $100 or more invoke their right to a hearing, and argue that "aggrieved individuals whose claims are small will not find it so worth their own time to go to hearing where the amount involved is small as when it is large." Memorandum in Support of Plaintiffs' Motion for Summary Judgment, p. 27. Quite apart from the inconsistency of this assertion with the plaintiffs' contention that beneficiary dissatisfaction with the current scheme is so strong as to provoke regular complaints to governmental officials, *id.,* p. 28, the plaintiffs' conjecture is contradicted by experience. The Senate Finance Committee found that, prior to the imposition of a $100 amount-in-controversy requirement for hearings under Part B, fully 45% of hearings for Part B disputes involved amounts of less than $100. S.Rep.No. 92–1230, 92d Cong., 2d Sess. 213 (1972).

would be upheld only if the state could demonstrate that the schemes furthered a substantial statutory objective.

 The reasons for the extension of a level of heightened review to sex and illegitimacy, however, are absent in the case of the amount-in-controversy requirement at issue in the present case. The challenged Medicare provisions divide beneficiaries into two groups according to the size of their claims. A classification based upon the monetary value of a Medicare claim has little in common with the classificatory schemes based upon permanent, stigmatizing characteristics to which the Supreme Court has extended a higher standard of equal protection review. *See Frontiero v. Richardson, supra*, 411 U.S. at 684–87, 93 S.Ct. 1764; *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1937). In *Rubin v. Weinberger*, 524 F.2d 497 (7th Cir. 1975), the United States Court of Appeals for the Seventh Circuit applied a rational basis standard in upholding judicial review limitations in the Medicare program against an attack on equal protection grounds. The Seventh Circuit affirmed the constitutionality of 42 U.S.C. § 1395ff(b)(2), which establishes a $1,000 amount-in-controversy requirement for judicial review of an individual beneficiary's claims under Part A of the Medicare program. The court declared that Congress's desire to avoid overburdening the courts with claims involving less than $1,000 was a rational, and hence, constitutionally permissible, justification for the limitation. *Id.* at 500 n.4.

The court does not understand the plaintiffs to contest the fact that a rational justification underlies the $100 limitation attacked here. Congress's declared purpose for limiting the availability of evidentiary hearings under the Medicare program was to reduce the financial burden upon the program by restricting beneficiaries with small claims to alternative review procedures.[16] Under any of the various formulations and applications to which rational basis scrutiny has yielded, *see, e. g., McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *McGowan v. Maryland*, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Williamson v. Lee Optical Co., supra*, 348 U.S. at 488, 75 S.Ct. 461, the statutory distinction between claimants with claims of under $100 and claimants with claims of $100 or more has a reasonable basis.