George H. MORGAN, Plaintiff,

v.

J.K. MANSFIELD, Stephen C. Good, Raymond W. Millikin, Jr., Thomas S. Williamson, Jr., and Phillip A. Lowe, Defendants.

Civ. A. No. 79-M-1614.

United States District Court, D. Colorado.

Aug. 23, 1983.

---

4. The Court signed and filed the Preliminary Injunction after the July 14, 1983 hearing of this matter.

Thomas Reed, Boulder, Colo., Anthony Renzo, Denver, Colo., for plaintiff.

Gregory Fess, U.S. Dept. of Energy, Washington, D.C., Richard A. Jost, Asst. U.S. Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER FOR SUMMARY JUDGMENT

MATSCH, District Judge.

This is an action for compensatory and punitive damages against five officers and employees of the United States Department of Energy's ("DOE") Office of the Inspector General ("IG"). The plaintiff was employed as the senior legal specialist in the Technology Commercialization Division of the Solar Energy Research Institute ("SERI") in Golden, Colorado, a national laboratory funded wholly by the United States through DOE and operated by Midwest Research Institute ("MRI"), a not-for-profit corporation organized under the laws of Missouri. SERI employees work for MRI which in turn contracts with DOE.

The Office of the Inspector General in DOE was created by Congress and charged with responsibility for investigating and reporting to the Secretary of DOE and to the Congress on fraud, waste, and abuse in federal programs financed by DOE. 42 U.S.C. § 7138. The IG is also charged with recommending policies and programs for promoting economy and efficiency in the administration of programs and operations of DOE. *Id.* During the times relevant to this action, the defendant Mansfield was the Inspector General, Williamson was the Deputy Inspector General, Lowe was the Deputy Assistant Inspector General and the defendants Good and Millikin were inspectors employed by the IG.

The SERI operation in Golden was the subject of an IG inspection which involved a review of management controls. From January 15 to January 23, 1979, a seven-member team, including the defendants Millikin, Good and Lowe, conducted that inspection and the results were set forth in a preliminary report which questioned practices and policies without making any reference to particular individuals.

In February, 1979, the defendants Good and Millikin conducted a follow-up review of SERI management practices with detailed examination of certain questioned expenditure reimbursements. The result was a second written report, entitled "Report on Inspection of Certain Unallowable, Unnecessary and Unauthorized Expenditures at the Solar Energy Research Institute," dated May 17, 1979. That report specifically mentioned the plaintiff by name and title and contained conclusory comments that George Morgan was "the most conspicuous spender" and "the leading offender" in payment for unallowable entertainment expenses. The principal conclusion of the report is that the unauthorized practices with respect to payment for entertainment and travel can be attributed to management deficiencies in SERI, MRI and DOE.

The references to George Morgan and others by both names and titles and the characterizations which are challenged here were inserted into the final report by direction of the defendant Williamson.

This SERI report was released to the public through news industry sources and it was the subject of comment from officials at MRI. Approximately six months after release of the report, George Morgan's employment at SERI was terminated. There is a factual dispute with respect to what role, if any, the critical report had in that termination of employment. For purposes of this opinion, it must be assumed that the plaintiff could persuade a trier-of-fact that there was a causal connection between the report and the termination. There is also a factual dispute concerning the accuracy of the information about, and characterization of, the plaintiff in the subject report. Again, for purposes of the present motion, it must be assumed that the information

and the characterizations are false and defamatory.

The theory of this civil action is that by publishing this report without providing the plaintiff an opportunity to challenge the contents, the defendants caused an infringement of George Morgan's "liberty interests" in violation of the protections provided by the due process clause of the Fifth Amendment to the United States Constitution. Damages are sought from them under the principles first announced in *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The defendants moved for summary judgment of dismissal upon the contentions that even with these factual assumptions, there is no infringement of any right protected by the Constitution and their conduct comes within the qualified immunity doctrine as most recently expressed in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ The first question to be considered is whether the loss of employment with a government contractor as a result of a defamatory governmental report, released publically, involves a "liberty interest" within the protection of the due process clause. I hold that it does not.

The question is not free from difficulty. Historically, redress for an injury to reputation and loss of earnings resulting from the publication of false statements concerning unfitness for office or profession was obtained by an action for defamation. Immunity from liability in the form of "absolute privilege" was granted for certain governmental speakers acting in their official capacities as legislators, judges, and administrators. *See e.g. Iverson v. Frandsen,* 237 F.2d 898 (10th Cir.1956). The justification was that the public interest in effective government outweighed the injury to the private interest involved. Some speakers were given only a conditional privilege. *See e.g.* Restatement (Second) of Torts § 595 (1977). Generally, defamation claims against local and state governments for the statements made by their officers and agents were barred by sovereign immunity

and by the Eleventh Amendment to the U.S. Constitution. Defamation is not a tort for which the United States can be liable because it is an express exception to the waiver of sovereign immunity under the Federal Tort Claims Act. *See* 28 U.S.C. § 2680(h).

With the engorgement of government at all levels, resulting from the exponential expansion of prohibitory and regulatory policies and the proliferation of publicly financed programs, the difficult task of finding a proper balance between the individual and public interests has become the preoccupation of the courts. At times, judicial efforts to define the point of balance have produced some prodigal precedents which are little more than editorials for the remedy of some viscerally perceived injustice. We who write opinions deciding cases are well advised to remember the constraints of the factual contexts within which we work. It is that caution which makes disposition by summary judgment so rare an event. It is the same caution which dictates care in analyzing the applicability of the generalizations about constitutional protections contained in appellate opinions.

In *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), the Supreme Court held that complaints challenging the Attorney General's designation of certain organizations as "Communist" on a list subsequently furnished to the Loyalty Review Board for use in connection with determinations of disloyalty of governmental employees were erroneously dismissed for failure to state claims for declaratory and injunctive relief. Although five separate opinions were filed, the majority of justices were agreed that such labelling of groups and individuals without notice and hearing involved the due process clause of the Fifth Amendment. None of the majority justices, however, identified the "liberty" or "property" interests which required due process protection. The three dissenters found neither "liberty" nor "property" rights were involved and, accordingly, concluded that due process did not apply.

Subsequently, in *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court concluded that the refusal to grant access to a security area of a military installation did not have due process implications. The denial of an opportunity to work at one specific place over which the national government had exclusive control in the exercise of the delegated power to provide for the common defense was not an unconstitutional foreclosure of a private interest, at least in the absence of government action bestowing a "badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." *Id.,* at 898, 81 S.Ct. at 1750.

One decade later in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Supreme Court declared unconstitutional a Wisconsin statute which permitted a chief of police, without notice or hearing, to post in all retail liquor outlets in his city a notice prohibiting sales or gifts of liquor to named persons who, "by excessive drinking," produced described conditions or exhibited specific traits, "such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." *Id.,* at 434, 91 S.Ct. at 508. The focus of the court's inquiry was whether the private interest was such as to require the protection of procedural due process. The court's affirmative answer was expressed in these words:

> Yet certainly where the State attaches 'a badge of infamy' to the citizen, due process comes into play... 'The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' (*Quoting Joint Anti-Fascist Refugee Comm. v. McGrath, supra*) (Frankfurter, J., concurring).

> Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.

*Wisconsin v. Constantineau, supra,* at 437, 91 S.Ct. at 510. It should be noted that in writing for the Court, Justice Douglas did not attempt to characterize the affected interest as either "liberty" or "property."

The distinction between "liberty" and "property" interests was considered one year later in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In rejecting the "liberty" assertions of a nontenured university professor, the Court said:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case... Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.

*Board of Regents v. Roth, supra,* at 573, 92 S.Ct. at 2707. Moreover, the respondent's "abstract desire" for continued employment did not rise to a constitutionally protected "property" interest. Thus, the threshold requirement for due process protection—the existence of a constitutionally protected "liberty" or "property" interest—was not satisfied.

The distinction between "liberty" and "property" interests became blurred in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), another teacher case, in which the Court held that the plaintiff must be given an opportunity to prove the existence of a *de facto* tenure system in the context of a failure to renew employment under circumstances suggesting reprisal for the exercise of rights protected by the First Amendment. Additional confusion was generated by the five opinions filed in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Court invali-

dated an Ohio statute permitting the disciplinary suspension of public school students without notice and an opportunity to be heard. From state law, a protectable "property" interest in educational benefits was recognized. In addition, a "liberty interest in reputation" was implicated:

'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied'... School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment.

*Goss v. Lopez, supra,* at 574–575, 95 S.Ct. at 736.

The notion that when reputation is damaged by the action of agents of government, the individual interest is elevated above the common law claim to the level of a right secured by the U.S. Constitution, as suggested in the cases discussed, was severely undercut by the majority opinion in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). There, two police chiefs of Louisville, Kentucky and the adjacent county distributed to about 800 merchants a "flyer" identifying "active shoplifters" by names and "mug shot" photographs. The plaintiff's name and picture appeared on the flyer and, while he had been arrested for shoplifting, his case never went to trial and the charge was dismissed shortly after circulation of the flyer. The plaintiff sued the police chiefs under 42 U.S.C. § 1983, alleging that his employment as a newspaper photographer had been threatened as a result of this publication. The District Court granted a motion to dismiss upon the conclusion that the facts alleged did not deprive the plaintiff of any right secured by the U.S. Constitution. The Court of Appeals reversed, relying on *Wisconsin v. Constantineau, supra.* See *Davis v. Paul,* 505 F.2d 1180, 1182 (6th Cir.1974).

The Supreme Court reversed the circuit court and affirmed the dismissal in language which is somewhat confounding. Recognizing that the plaintiff had clearly stated a claim for defamation by the police chiefs, the Court said 424 U.S. at page 701, 96 S.Ct. at page 1160:

The words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law. While we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause.

Writing for the Court, Justice Rehnquist reviewed the cases which I have discussed and, at pages 708–9, 96 S.Ct. at page 1165, made the following distinction from the result reached in *Wisconsin v. Constantineau, supra:*

We think that the italicized language in the last sentence quoted, 'because of what the government is doing to him,' referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry. 'Posting,' therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards. The 'stigma' resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived Constantineau of any 'liberty' protected

by the procedural guarantees of the Fourteenth Amendment.

The significance of the opinion as guidance for the trial courts is contained in the following summary at pages 711–712, 96 S.Ct. at pages 1165–1166:

> In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioner's actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law.

*McGhee v. Draper,* 639 F.2d 639 (10th Cir.1981), and *Miller v. City of Mission, Kansas,* 705 F.2d 368 (10th Cir.1983) are consistent applications of the principles articulated in *Paul v. Davis, supra.* In those cases, a school teacher and another type of public employee lost those positions through governmental actions which were stigmatic and publicly disseminated. Thus, they suffered the loss of a status conferred upon them by state law under circumstances which damaged their reputations and harmed their ability to pursue their professional interests in obtaining similar employment. That was sufficient to establish "liberty" interests protectable by some degree of procedural due process.

Those elements are not present in this case. George Morgan did not obtain a position or status through government action. He was not a public official. He was an employee of a company which contracted with DOE to provide his services and those of the other MRI workers at SERI. That is not the type of status considered sufficient to raise reputation to the level of "liberty" under *Paul v. Davis, supra.* While it is assumed that the statements were false and defamatory, there is not the kind of stigma which would be expected to impede the plaintiff in the pursuit of his professional career. In context, it was said of Mr. Morgan that his vouchers were prime examples of the results of a system of loose management without adequate controls to insure the efficient use of public funds. Nothing written about the plaintiff could be considered to have placed a "badge of infamy" on him. Accordingly, the plaintiff's private interest in this case is not deserving of the protection of the due process clause of the Fifth Amendment.

■ The second question to be considered is whether the defendants are protected from any individual liability for an assumed invasion of the plaintiff's constitutionally protected rights under the doctrine of qualified immunity. This affirmative defense was developed in cases brought against state officials under 42 U.S.C. § 1983. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court recognized the same defense for federal officials. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982),

the Court showed an appreciation for the difficulty of dealing with general allegations of constitutional torts and articulated an objective standard which can be applied without trial on the issue of the actual intent of a defendant, at least in the absence of a showing of malice. In this case, while the pleadings included allegations of improper motives, plaintiff's counsel withdrew that contention at oral argument of the motion for summary judgment.

The test to be applied is whether a reasonable person in the position of the defendants would know that the action taken was a violation of any clearly established constitutional right of George Morgan. I have concluded that, as a matter of law, no constitutionally protected interest was infringed in this case. If that conclusion is wrong, it is at least a reasonable construction of the cases discussed in this opinion. The defendants should not be held to a higher standard of understanding of constitutional law. Accordingly, the defendants' affirmative defense of qualified immunity is established and they are entitled to summary judgment.

Upon the foregoing, it is

ORDERED, that the defendants' motion for summary judgment is granted and the Clerk shall enter a judgment dismissing the plaintiff's claims and for the award of the defendants' costs.